RADIO CORPORATION OF AMERICA, a corporation,
Defendant Below, Appellant,

*vs.*

PHILADELPHIA STORAGE BATTERY COMPANY, a corporation,
Complainant Below, Appellee.

RADIO CORPORATION OF AMERICA, a corporation of the State of Delaware,

Cross-Complainant Below, Appellant,

*vs.*

PHILADELPHIA STORAGE BATTERY COMPANY, a corporation of the State of Pennsylvania,

Cross-Defendant Below, Appellee.

*Supreme Court, On Appeal, May 13, 1939.*

LAYTON, C. J., RICHARDS, RODNEY, SPEAKMAN and TERRY, JJ., sitting.

*Clarence A. Southerland* of the firm of Ward & Gray, (*John W. Davis,* of New York City, *Manton Davis* and *Albert G. Davis,* both of New York City, and *Thomas G. Haight,* of Jersey City, N. J., of counsel), for appellant.

*Robert H. Richards* and *Caleb S. Layton,* of the firm of Richards, Layton & Finger, and *Hugh M. Morris,* (*C. J. Hepburn, Charles C. Norris, Jr.,* and *Philip R. Hepburn,* of Hepburn & Norris, all of Philadelphia, Pa., of counsel), for appellee.

LAYTON, Chief Justice, delivering the opinion of the court:

This cause is before the court on an appeal from a decree of the late Chancellor enjoining a threatened cancellation of a license granted by RCA to a licensee to manufacture and sell radio apparatus, and by it assigned to PSB with the consent of the licensor; establishing, by interpretation of the license agreement as amended, a base for the computation of royalties; and, consequently, setting a formula for an accounting between the parties.

In the documents constituting the license agreement the terms, "receiver," "complete radio receiver," "complete set," "licensed apparatus" and "complete apparatus," were used, and it is with respect to the precise scope and meaning of those terms as related to a base for the calculation of royalties that the parties became at variance.

The disagreement between the parties was not of an immediate occurrence. For some time, PSB manufactured and sold a complete receiving set with cabinet packed in a carton for delivery to the public, and paid royalty thereon. But, as PSB sought, within the terms of the license agreement as interpreted by it, to narrow the royalty base and thereby to reduce its royalty obligations, disputes arose. PSB made certain royalty payments under protest to obviate the danger of cancellation of its license. PRT was a wholly owned subsidiary corporation through which its sales to the public were effected; and when PSB was reorganized, and PRT was created, as it was claimed, as a

separate and independent corporation, and PSB manufactured and sold to it a unit comprising a radio receiver and loud speaker only, and disclaimed liability for the payment of royalty on anything more, the differences between the parties became acute.

Briefly, the parties differ as to what is the base on which royalties are calculable and payable. RCA contends that the base is the selling price of a radio receiving set complete with cabinet as offered to the public, and not a radio receiver in the trade or technical sense; and that PRT is a mere instrumentality or sales department of PSB, set up to enable PSB to escape its just obligations. PSB contends that it was licensed to manufacture and sell a complete radio receiver in the trade sense of the term, and under the amended license agreement it was authorizd, at its option, to manufacture and sell a unit comprising a complete receiver and a loud speaker only; that it sold all of its product to PRT, an entirely separate and independent corporation; and that it was liable for royalty on the selling price of the product sold by it to PRT.

The immediate question at issue, then, is what, under the license agreement, is the base for the calculation of royalties?

Radio is essentially an electric science. Progress in the science has been very rapid, due largely to the enormous public interest in the subject, to keen competition, and to the ever widening circle of radio enthusiasts, both amateur and professional. Broadly speaking, radio reception means the reception of signals from a certain distant transmitter with a reasonable degree of loudness and a minimum interference from other sources of radio transmission. A radio receiver is a device comprising apparatus that converts radio waves into sound waves of the same character as those emitted from the speech or music broadcast. The ap-

paratus, when electrically energized, receives from the antenna radio frequency signals and transforms them into audio frequency signals. Thermionic valves or tubes are necessary. Electric power from dry cells, storage battery or generating plant is required; and where the alternating current from a generating plant is the source of electrical energy, a device known as a battery eliminator is made necessary in order to change the alternating current to a direct current. The devices and contrivances, coils, electrical circuits and tubes, designed to receive, select and amplify sound, comprising the essential elements of a radio receiver are, for commercial purposes, arranged and mounted on a frame, called a chassis, and the combination of the essential elements so mounted constitutes a receiver in the trade sense of the word. The use of the word "chassis" connotes a radio receiver.

To reproduce the audio frequency signals so that they may be heard, some form of telephonic appliance is necessary. In the early days of the art, a head set was generally used. This device was followed by what is known as a loud speaker. There were, and are, loud speakers of many kinds and varying degrees of excellence. While essential for the reproduction of sound to the ear in the absence of a telephone head set, a loud speaker is no part of the receiver. A receiving set comprises a receiver and some form of telephonic device; and as the loud speaker is generally employed, it may be said with some approach to accuracy that a receiving set consists of a receiver and loud speaker.

The case or cabinet in which the receiver is housed is not a necessary component of a receiving set, although the cabinet may be so constructed as to improve the sound. A complete radio receiving set ready for immediate use by the purchasing public may be defined to be a combination of receiver, loud speaker, batteries or battery eliminator, tubes and other devices necessary or useful for satisfactory au-

dible reception, including a cabinet in which the combination is installed.

It is stated in the appellees brief that RCA, through its ownership or control of over upwards of 4000 patents, absolutely dominates the radio industry; that without license from it no one can manufacture a radio receiver; and that, through a subsidiary, it manufactured and sold radio receivers in active competition with its licensees. This statement is important only as evidencing freedom in the imposition of terms by RCA upon its licensees, and as giving some weight to the thought that as RCA must have a great investment, and as it is a profit corporation, it may be supposed that its grants to licensees are not so rigid and exacting as seriously to interfere with the popularization of the use of radio apparatus.

It may be readily accepted that RCA was, and is, careful to determine the character and extent of the licenses which it grants. The license agreement under consideration is in the language of RCA. It chose the words and terms, framed the sentences and ordered their arrangement. The language of the agreement is to be construed most strongly against it. 3 *Williston Contr.*, § 609; 13 *C. J.* 554; 6 *R.C.L.* 854. Moreover, the grantor of the license, engaged as it was in a trade or business involving a particular science and art, may be supposed to have employed terms and expressions especially adapted to, and as understood in, the trade; and if technical words and terms are used, they are to be interpreted as usually understood by persons in the trade, unless it is clear that they were used in a different sense. 2 *Elliott, Contr.*, § 1511; 12 *Am. Jur.* 237. Beyond question the court should consider the agreement as a whole, should put itself in the position of the parties, and should examine the circumstances in which the contract was made; and a construction should be sought that will give full force and effect to all of the provisions of the agree-

ment rather than, by attributing a narrow and technical meaning to a single term, produce confusion and uncertainty. *Good Humor Corporation v. Popsicle Corporation,* (D.C.) 59 *F.* 2d 344, *affirmed* 3 *Cir.,* 66 *F.* 2d 659. Rules for the interpretation of contracts are not inflexible, their purpose being to arrive at the probable intent of the parties; and where upon a consideration of the whole instrument, it appears that technical words are employed in a sense entirely different from their technical meaning, the meaning in which they are employed will be adopted. 12 *Am. Jur.* 237. It may be added that where the parties define the words or terms which they intend to use, the contract will be interpreted according to such definitions if free from ambiguity; and words used in one sense in one part of the contract will, ordinarily be considered to have been used in the same sense in another part of the same instrument, where the contrary is not indicated. 13 *C. J.* 489, 491. The rules of construction are well settled. The difficulty lies in a practical application of them.

There is little or no dispute with respect to the evidence of the case. In fact, the Chancellor regarded it as undisputed. In any event, this court will not disturb a finding of fact made by the Chancellor, unless, upon a careful review of the evidence, there is a conviction to a reasonable certainty that the finding was plainly unsupported by the evidence. *Eastern Shore Public Service Co. v. Town of Seaford, ante p.* 199, 2 *A.* 2d 265.

While at times, more especially with respect to other issues of the case, the appellant would seem to take issue with the Chancellor upon findings of fact, its dissent is not so much directed to basic facts as it is to inferences drawn therefrom. On the important question immediately in discussion involving questions of interpretation of words and terms contained in the documents comprising the agreement between the parties and the construction of the agreement

as a whole, there is little dispute as to facts. The appellant, in effect, challenges the statement made by a witness called as an expert by PSB that, in the trade, a receiver is known as chassis plus tubes. It compares with this evidence the statement of another witness called by PSB that, if one were to visit a retail store which sold "Philco" radios, and ask for a "Philco" receiver, he would be shown the complete instrument housed in a cabinet; and that he would not try to correct anyone who called the entire instrument a radio receiver. The testimony of the witness with respect to the understanding in the trade of the term "radio receiver" is, to an extent, instructive and helpful, but it has not the importance seemingly attributed to it by the parties. It seems to us that it is not difficult for the average intelligent mind to disassociate the instrument known as a radio receiver from the case or cabinet in which it is enclosed for sale to the public; nor to recognize as a radio receiver the combination of devices and contrivances which mounted compactly on a frame is capable of receiving and reproducing sound. And, it is much to be doubted that the ordinary costumer would use the word "receiver" at all. It is far more probable that he would ask for a "radio". The testimony of the witnesses is not contradictory when fairly considered.

The original license agreement, which was assigned by the licensee named therein to PSB, granted to the licensee a personal, indivisible, non-transferable and non-exclusive license to manufacture at a designated place and to sell only for radio amateur reception, radio experimental reception and radio broadcast reception throughout the United States and its territories or dependencies, "Tuned Radio Frequency Receivers" as defined in paragraph (d) of Article 2 of the agreement.

Paragraph (a) of Article 2, defined the term "amateur reception" as meaning reception by one not a professional

investigator who is more than a mere broadcast listener, and who evidences his interest in the art of wireless telephony by study, investigation or experiment. By paragraph (b), the term "experimental reception," was stated to mean the use in a laboratory, college, school or scientific society, or in professional investigations, but not in any case reception of messages for business purposes. Paragraph (c) defined "broadcast reception" as the reception of news, music, speeches, sermons, advertising and similar matter, for the purpose of exhibition, entertainment or instruction.

The grant of the license specifically, was not extended to the manufacture and sale of superheterodyne or super-regenerative receivers or parts thereof. The royalty was established at seven and one-half per cent of the licensee's net selling price of the "apparatus" licensed and sold, except that no royalty was exacted nor royalty reports required with reference to sales of apparatus purchased from or through RCA. The right to manufacture, use or sell vacuum tubes, except to use and sell tubes purchased from RCA, was forbidden; and RCA agreed to sell and PSB agreed to buy the necessary number of tubes required to make initially operative the apparatus licensed.

As the object of the grant of the license to manufacture and sell radio receivers was the opportunity to supply the requirements of the public, it may reasonably be supposed that the definition of a tuned radio frequency receiver would be reconcilable with the several classes of reception so carefully particularized in the agreement. So, by paragraph (d) of Article 2, the term, Tuned Radio Frequency Receiver, was defined as, "a complete radio receiver advertised as such and salable to the using public as such, which may include a cabinet, head set, loud speaker, battery eliminator, etc."

It is of the first importance to determine what was meant by the definition of a tuned radio frequency receiver.

The primary meaning of "definition" is a setting of limits; and, manifestly, the entire limitation must be considered to ascertain precisely what was licensed to be manufactured and sold, and what was the "apparatus" upon which royalty was to be paid. Not only is all of the definitive language to be considered, but the whole agreement as well. In the appellant's brief is found the statement that the apparatus licensed "was defined to be a complete radio receiver advertised as such and salable to the using public as such." The words in immediate sequence, "which may include a cabinet, head set, loud speaker, battery eliminator, etc.", are ignored. If, elsewhere in the briefs, the words are noticed at all, they are given a trifling importance. We are of the opinion that these words to which the appellant now gives such scant attention formed a substantive part of the definition of a tuned radio frequency receiver, and were properly and logically used when the several kinds of radio reception as defined in the license agreement are considered. The amateur receptionist is, under the license agreement, more than a mere broadcast listener; while not a professional investigator, he is one who evidences his interest in the art by study and experiment. Such person might well desire to purchase several types of receivers, or more than one receiver of the same type, for study and experiment. To him the cost of a cabinet might well be regarded as a useless expense. Conceding that a cabinet may have a certain useful value with respect to sound and tone, the amateur might desire to build his own. He might prefer a head set to a loud speaker. The necessity for a battery eliminator would depend, of course, upon the source of electrical energy available. With respect to the various contrivances and devices designed to improve receptivity, selectivity and quality coming within the all embracing abbreviation, "etc.," he might want all of them or none. It is well known that at the date of the license many persons built their own receivers from parts purchased on the mar-

ket, or having purchased a receiver, added to it with the knowledge, or hope at least, that their experimental impulses would be rewarded by an improvement in selection, reception or tone. Many persons, likewise, built their own cases or cabinets. The same observations apply with even greater force to the experimental receptionist. The license agreement expressly recognized the existence of classes of persons occupying a position entirely different from the mere broadcast listener; and the specifically defined classes of reception and, consequently, of receptionists, are direct evidences of the limitations of the terms, "receiver," as used in the license agreement. They point out recognized fields of demand which the licensee was permitted to supply. But, it is said that PSB sold only to the broadcast receptionist, that is to say, to the class of persons that may be designated as mere broadcast listeners. This may be conceded; but apart from the applicability of the principle of practical construction as an interpretative aid, the immediate concern is not what PSB chose to do, but what it had the right to do under the license agreement.

Unless the phrase, "advertised as such and salable to the using public as such," was of such force and effect as to destroy the plain and natural meaning of what, for brevity, may be called the optional clause of the definition, it would seem clear enough that, by the term "Tuned Radio Frequency Receiver," was not meant a rigid and unyielding thing, but a thing as to which the licensee was granted a measure of latitude and independence in manufacture and sale. Logically this is so, in view of the several classes of receptionists contemplated in the license agreement, and the optional or permissive language of the definition of a complete radio receiver. Practically this is so, for the reason that to have required the licensee to manufacture and market a radio set complete with cabinet and other accessories would tend to deprive the licensee of available mar-

kets and thereby reduce the volume of sales upon which both the licensor and licensee relied for profits.

What was licensed to be manufactured and sold was a complete tuned radio frequency receiver. As we view the definitional language, the licensee was licensed to manufacture and sell a thing variable within certain limits: nothing less than a complete radio receiver, but, at the option of the licensee, the same thing in combination with other named and unnamed devices comprehended within the words, "cabinet, head set, loud speaker, battery eliminator, etc." The language is permissive, and in no sense mandatory. It has, of course, a negative as well as an affirmative significance. The appellant attempts to draw a distinction between the meaning of the word "include," and the words, "added to." It argues that the contract says— not that certain things may or may not be added to the licensed receiver—but that the licensed receiver may include those articles; and that whatever any particular receiver may or may not include, it must be a complete radio receiver. The diorism is not substantial.

The court below, in commenting on the definitional language of the license agreement, said:

> "As stated before, the original license agreement authorized the manufacture and sale of Tuned Radio Frequency Receivers. But, for royalty purposes, the contract made an arbitrary addition to the strict scientific meaning of the term. It provided that it 'may include a cabinet, head set, loud speaker, battery eliminator, etc.' The 'etc.' is important. Thus, the thing licensed under the patents was one thing and the articles upon the selling price of which royalties were to be paid for the privilege of manufacturing and vending the patented apparatus, was the thing licensed and more."

The appellant contends that it was at this point that the court below committed fundamental error in holding that there was a difference between the article which was licensed, and the article upon which royalties were to be paid.

We are of opinion that the Chancellor's appreciation of the license agreement was essentially correct. His comment disclosed a realistic view of contractual consequences. RCA was in a position of domination. It was able to impose terms with respect to royalties to be paid. Seven and one-half per cent was demanded on the licensee's net selling price of the apparatus licensed under the agreement and sold by it thereunder; but no royalty was required to be paid on other apparatus purchased from or through RCA. This is understandable. The thing licensed was a complete radio receiver. Upon this royalty was payable at all events. If the licensee purchased other apparatus from RCA no royalty was exacted thereon, nor were royalty reports required to be made. RCA was content, it may be supposed, with its sales profit on such apparatus. But if the licensee elected to purchase such apparatus from others, or to manufacture it, and to assemble such apparatus with the receiver and market the product, in such case, in lieu of its profit on its sales of such apparatus, RCA exacted royalty on the complete receiver and the apparatus assembled with it. If it be said, therefore, that PSB was licensed to manufacture and sell a complete radio receiver, either as such or in combination with other articles or apparatus, at its option, and was obligated to pay royalty on the net selling price of the apparatus licensed, or on the net selling price of the apparatus licensed in combination with other apparatus, the same result is reached. The terms, "maximum royalty base," and "minimum royalty base," will serve to express the conception. The appellant's argument is more a war on words and phrases than a practical exposition of its own language.

Such, we think, is the extent and effect of the definition as applied to the apparatus licensed to be manufactured and sold, unless impaired or destroyed by the phrase, "advertised as such and salable to the using public as such." Upon this phrase the appellant founds its contention that the thing licensed to be manufactured and sold was a com-

plete radio receiving set housed in a cabinet, precisely as it was offered to the buying public.

This controversial phrase immediately follows the word "receiver," but in immediate sequence is the optional clause "which may include a cabinet * * *". A common sense construction of the term "complete radio receiver" and its qualifying phrases, adding nothing and subtracting nothing is that the primary thing licensed was a radio receiver complete in all of its essentials and ready to function as such, advertised as a complete receiver and salable as a complete receiver to the using public, an instrument upon which the buyer might rely as complete with no necessity for the addition of any other essential. Reading the definition as a whole there is no requirement, or reasonable suggestion, that the thing licensed was a radio set complete with cabinet advertised as a radio set complete with cabinet and salable as such. The implied prohibition contained in the definition is against the manufacture and sale of an incomplete radio receiver, a thing lacking in some essential. The agreement does not require the licensee or anyone else to advertise. That a licensee might, and probably would, sell its product through distributors is easily recognizable. A distributor no doubt would, as did PRT, advertise the merchandise, and in such manner as to appeal most strongly to the public. But it is entirely unreasonable to suppose that the definition of the thing licensed, despite the careful language of the contract, should come in the end to depend, not upon the words and phrases chosen by the appellant itself, but upon advertising verbiage. The definition of a complete radio receiver is to be found in the agreement, not in advertising for which, peradventure, the licensee is not responsible. As the Chancellor aptly said, the problem of definitions cannot be transferred from the contract where it was specifically dealt with, to the uncertain and highly indefinite field of advertising material. Quite apart from this, radio receivers, at the time of the contract, and even

now, were, and are, frequently advertised as receivers (of a designated number of tubes) "housed in" cabinets of certain types and models; and without violence to the language of the license agreement, complete radio receivers were, and are, advertised "as such". There is no difficulty with respect to the phrase "salable to the using public as such." This part of the definitional expression is satisfied if the receiver is capable of being sold as an instrument containing all of the essentials of a radio receiver. The licensor was protecting itself against the manufacture and sale of parts of a receiver, or receivers lacking some essential.

Apart from abstractions, and construing the language of the license agreement reasonably and practically, we are of opinion that the licensee was not required to manufacture and sell more than a complete radio receiver, consisting of a chasis and tubes; and that, upon its election so to do, the minimum royalty base was the net selling price of the apparatus as thus constituted. The appellant could have defined a tuned radio frequency receiver as a complete radio receiver housed in a cabinet. It did not do so. A construction, doubtful, at best, ought not to be indulged to its greater advantage and profit.

We come now to the letter of May 28, 1929, which is called the first cabinet allowance letter. By the terms of this letter royalty was to be paid on an amount determined by subtracting from the net selling price of each radio receiving set sold by the licensee, the net cost of the cabinet plus that portion of the licensee's total profit fairly attributable to the cabinet, and then adding $2.00 in lieu of the deduction as the useful value of the cabinet. Manifestly, the letter does not purport to alter the definition of "receiver," or to change in any manner the base for the calculation of royalty. PSB had been manufacturing and marketing a complete radio receiving set with cabinet packed in a carton ready for delivery to the ordinary purchaser, and had

been paying royalty thereon. The letter was the first authorization of deductions in the computation of royalties. In this letter the term, "radio receiving set," is used; and the appellant contends that it was recognized by PSB that the starting point for royalties was the selling price of the "entire radio receiving set," a term or phrase which it regards as synonymous with the term "receiver" as used in the original license agreement. We do not agree with this reasoning. The conclusion is based upon a highly strained inference from language which the appellant itself has seen fit to employ. The term, "radio receiving set," is readily referable to those cases where the licensee has elected to manufacture and market a complete radio receiving set housed in a cabinet, a practice which PSB had been pursuing. It had been paying royalty on the entire article as manufactured and sold. The letter had no other or further significance than to permit a deduction with respect to the cabinet which was a part of the complete set sold.

This letter, as it appears, was not understood by several of RCA's licensees, and it was followed by an explanatory letter of October 16, 1929. In this letter the term, "complete set" is used, and the term "cabinet" is defined as including only the case enclosing the radio set. Speaker units, motors, magnetic pickups, phonographic turn-tables and other things, were not to be included in the calculation of the cabinet allowance deduction. The appellant contends that this letter contains the only definition of what the parties meant by "cabinet," and that it was the "complete set" which was again understood as being the same thing as "complete radio receiver," the total cost of which was to be computed. However true this statement may be in a case where a complete radio receiver housed in a cabinet was the article manufactured and sold, it is impossible to conceive of the cabinet allowance letter with its explanation as destroying or impairing the optional right of the licensee to manufacture and sell something less than a complete radio

set. The optional or permissible royalty bases were left untouched. The letter granted a specific and limited deduction in cases where the net selling price of a complete radio receiving set was the base for the calculation of royalty. It is unreasonable to look to the phraseology of letters permitting specific and limited deductions with respect to the case enclosing the instrument known as a radio receiver for a definition of the term, "receiver," when the license agreement itself had expressly undertaken to declare the limitations.

Moreover, as will be seen, the letter of May 28, 1929, was specifically cancelled by the amendatory letter of February 27, 1932, and, necessarily, the explanatory letter fell with the cancellation.

The origial license agreement was amended by the appellant's letter of proposal, dated October 31, 1930, and accepted by PSB. It was proposed that from and after the date of the letter the "said License Agreement" should be deemed to include licenses to manufacture and sell, "instead of only Tuned Radio Frequency Receivers," the following apparatus; (a) All complete radio telephone broadcast receivers for amateur, experimental and broadcast reception; (b) all complete radio broadcast receivers of pictures (including television) for use in homes; and (c) all complete apparatus for use in homes for reproducing pictures and talking pictures. By the second article, "radio broadcast receivers" of sound or pictures, was stated to mean complete apparatus (but not separate parts thereof except for repair or replacement in apparatus licensed under the agreement) advertised as such and salable to the using public as such, which may include a cabinet, head set, loud speaker, battery eliminator, projector and screen, with the proviso that radio tubes might be omitted at the election of the licensee from such complete apparatus.

The three types of "reception" were not changed. The

grant was extended to permit the manufacture and sale of superheterodyne, super-regenerative and other types of receivers, instead of only the tuned radio frequency receiver. The manufacture and sale of separate parts except for repair or replacement in apparatus licensed was expressly forbidden. The term, "complete apparatus" was used for the first time. The abbreviation "etc."—was omitted from the definitional paragraph; and tubes were placed in the optional class.

The term, "complete apparatus" was used, and properly so, for the licensee was permitted to enter into a larger radio field. The term, "receiver," or, "complete radio receiver," would not suffice. The term, "complete apparatus," would be adequate. Substituting, therefore, "complete apparatus" for the term, "complete radio receiver," as used in the original agreement, no alteration of the definition of "receiver" was accomplished, for, in the same sequence as in the original agreement, were the words, "which may include a cabinet, head set, loud speaker, battery eliminator, projector and screen." The devices, projector and screen, have nothing to do with a radio broadcast receiver. So, by the omission of the all embracing abbreviation, "etc.," and the incusion of tubes in the optional class of things, the maximum royalty base was established as a combination of chassis (as that word is understood), tubes, cabinet, head set, loud speaker and battery eliminator; and as a minimum royalty base, the chassis alone was constituted.

Next in order is the second cabinet allowance letter of May 29, 1931. Effective as of April 1, 1931, the cabinet allowance plan was modified and extended to permit the licensee to base its royalty on the selling price of the complete receiver, including the cabinet, when the selling price of the cabinet as determined in accordance with the first cabinet allowance letter and the explanatory letter, was less than $2.00. The letter proceeded: "However, if you are

marketing a radio set (chassis and loud speaker) without the cabinet, being an incomplete set, two dollars ($2.00) must be added as heretofore for royalty purposes as the useful value of a cabinet."

The appellant contends that a complete receiver is expressly defined as including a cabinet, rather than a bare aggregation of parts. What we have heretofore said with respect to the unreasonableness of looking to a cabinet allowance letter for a definition of the thing licensed to be manufactured and sold, and, consequently, for the determination of bases for the computation of royalties, need not be repeated. The first paragraph of the letter does not purport to define anything. There is nothing in it that defines a complete receiver as a receiver plus a cabinet. There is present the same idea that a cabinet may be in combination with a complete receiver and, in that sense, a part of it; and that, if marketed by the licensee as such, royalty is to be computed in accordance with the plan under which certain deductions with respect to a cabinet were to be permitted. The second paragraph of the letter makes entirely clear whatever may be equivocal in the first paragraph. It recognizes the freedom of the licensee to market a radio set, comprising a chassis and loud speaker, without the cabinet. Such combination is spoken of as "an incomplete set," but by the most necessary inference the licensee's right to manufacture and market such set is made manifest. The appellant's argument finds this difficulty: if the term "complete receiver" always had meant a "complete receiving set," the addition of the words, "including a cabinet" would be superfluous. On the other hand, if a "complete receiver" may or may not include a cabinet, as the licensee may elect, the additional words have a definite meaning, and are descriptive of the combination of receiver and cabinet the selling price of which combination was under consideration.

The final amendment to the original license agree-

ment was accomplished by RCA's letter of proposal, dated February 27, 1932, and accepted by PSB. In Article 1, the license was granted to sell for export. The term "complete apparatus" is used. No prohibition of manufacture and sale of parts only is made, for that had already been provided for in the prior amendment. By the second article, Article 2 of the license agreement and the cabinet allowance letters of May 28, 1929, and May 29, 1931, were expressly cancelled; and in substitution it was proposed that the licensee agree to pay certain designated percentages of royalty based on the licensee's net selling price of the apparatus licensed thereunder before cash discount, etc., and sold by it during the continuance of the agreement. By the second paragraph of the article it was proposed that royalties should be computed and paid on an amount determined by making "the following deductions" from the net selling price of each "complete apparatus sold, * * * *when such parts are sold with such apparatus.*" The specific deductions appear under lettered sub-paragraphs. By (c) the deduction was by an amount corresponding to the portion of the net selling price of the complete apparatus represented by the cabinet thereof; by (d) by an amount corresponding to the net selling price of the complete apparatus represented by the *radio tubes* required for the initial equipment of the apparatus; and by (e), with respect to receivers for permanent installation in automobies, by an amount corresponding to the portion of the net selling price of the complete apparatus represented by *battery boxes, suppressors, external operating cables and antenna devices.*

After proposing that the amount so deducted in each case should be such percentage of the net selling price of the complete apparatus as the licensee's manufacturing cost or purchase price of cabinet, tubes and parts of automobile receivers, dependent on whether the licensee should purchase or manufacture them, should bear to the manufacturing cost of the complete apparatus, the proposal proceeded:

"Licensed apparatus shall comprise at least a chassis and loud speaker."

When the entire article is considered, it is clear that the term, "complete apparatus," has a like variable meaning as the term, "complete radio receiver," as used in the original agreement. The meaning of the term, in the sense of its comprehensiveness, is made dependent upon the "parts" sold with the apparatus. The phrase "the following deductions" can only refer to the "parts" enumerated in subparagraphs, (c), (d) and (e), to-wit, cabinet, tubes and automobile receiver devices; and, to remove any reasonable possibility of doubt, it is declared that the minimum of licensed apparatus shall be a chassis and loud speaker.

The amendment accomplished at least three things. It reduced the royalty rate. It broadened the minimum royalty base by shifting the loud speaker from the optional class of things to the mandatory class. And it allowed deductions, for royalty purposes, from the net selling price of the complete apparatus, a variable thing, by an amount corresponding to that portion thereof represented by cabinet or tubes, or cabinet and tubes, if and when sold in combination with the irreducible minimum, chassis and loud speaker.

By this amendment, the maxium base for the computation and payment of royalty was the net selling price of the combination, chassis, tubes, cabinet, and loud speaker; while, as a minimum base, the chassis and loud speaker were established.

If there is anything of ambiguity in the article, the fault lies with the licensor; and it is in no position, we repeat, to insist upon a construction most favorable to it. But, we think that there is nothing ambiguous or uncertain in the language of the supplemental agreement. It is entirely consistent with the general scheme (apart from spe-

cific deductions) of the original agreement, and as that agreement was modified by the letter of October 31, 1930. As we read the original agreement and its modifications there is plainly recognizable the purpose and intent to create, not a rigid and immutable base for the calculation of royalties, but a fluctuating base, dependent upon, within the limitations expressed, the choice of the licensee as to what it should manufacture and market. The term, "complete apparatus," may properly mean something less than a complete radio receiver housed in a cabinet and marketed as such. It may not comprise less than a chassis and loud speaker. It is none the less a "complete apparatus," by the language of the supplemental agreement, if the licensee manufactures and sells no more; and within the same term is comprehended chassis, tubes, loud speaker and cabinet, if that combination is manufactured and sold.

The argument of the appellant upon this phase of the controversy lacks substantial merit. It is highly artificial; and it is founded upon an emasculation of its own definitional terms.

The appellant contends that PSB, by its conduct and acts, and by its royalty reports and payments prior to 1932, gave a practical construction to the license agreement quite in accord with the appellant's contention.

It is a familiar rule that when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the courts. The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention. 2 *Elliott, Contr.,* §

1537; 12 *Am. Jur.* 787. But it is equally well settled that if the meaning of the contract is plain, the acts of the parties cannot prove an interpretation contrary to the plain meaning. 3 *Williston Contr.*, § 623; 12 *Am. Jur.* 790; 13 *C. J.* 548; *Westinghouse Electric & Mfg. Co. v. Tri-City Radio Supply Co.*, (8 *Cir.*) 23 *F.* 2d 678. The rule of practical construction relied upon by the appellant is not, of course, pertinent to the acts and conduct of a party to a contract which, clearly, confers upon him a choice or option. The fact that before July, 1934, PSB manufactured and sold a complete receiving set, including a cabinet, cannot be taken as a prohibition of its right under the agreement to manufacture and market something less, at its option, if the contract permitted it to do so. By no process of reasoning can it be said that, because PSB, for a time, did far more than it was legally bound to do, it precluded itself from exercising its option to do less. The inapplicability of the rule of practical construction to the situation presented is shown by the appellee in trenchant phrase. Before the reorganization of PSB, it says, it exercised its option and manufactured and sold the maximum, and now it is told that had defined the minimum.

There are no elements of an estoppel; nor is the appellee's conduct evidence of a modification of the license agreement. Whether PSB, with intention, exercised its option to manufacture and market a complete radio receiving set, or whether it was merely careless, or ignorant of the extent of its rights as a license of RCA, cannot serve to make less effective the express terms of the license agreement.

Article 8. of the amendment of October 31, 1930, contains a provision requiring the licensee, in the event that any apparatus licensed under the license agreement should be sold to a corporation, firm or association in which PSB or its stockholders owned a controlling interest by stock

ownership or otherwise, to pay royalties upon the invoice price at which such purchaser should resell the apparatus, rather than upon PSB's invoice price.

Prior to July 30, 1934, PRT was a wholly owned subsidiary of PSB. The reorganization of PSB's business which was effected on or as of that date resulted in an entire divorcement of the two companies. PSB ceased to own a share of PRT's stock. No officer or director of one company became an officer or director of the other. The two companies occupied the same plant, in the sense that the same roof covered both, but whatever space PRT required was definitely allotted to it, and adequate rent was paid. The two companies were, it is true, closely bound by a contract under which PSB sold its output exclusively to PRT, and to the same extent the latter bought and marketed PSB's output.

The appellant contends that PSB by its practical and contractual control over PRT may properly be said to own a controlling interest in PRT *otherwise* than by stock ownership; that PSB has breached the license agreement by dividing or sharing the benefits of its license with PRT; and that PRT is but the *alter ego* of PSB, or a mere instrumentality.

It is unnecessary to dwell upon this aspect of the appellant's case. The Chancellor, with the greatest care and thoroughness, examined the particulars of the appellant's charge. He considered in minute detail the facts and circumstances of the reorganization of PSB, the creation of PRT, and the contract entered into between them; and with like care, he weighed all of the evidence as it related to the appellant's argument that PRT came within the provisions of article 8 of the amendment of October 31, 1930. The greater part of the Chancellor's opinion was devoted to a searching examination of the appellant's contentions in this respect. His conclusions were that PRT was neither agent,

instrumentality, *alter ego* nor sales department of PSB subject to its control and domination, and that there was no dividing or sharing by PSB of the benefits of the license with PRT within the prohibition of the original license agreement.

These conclusions were the just and reasonable inferences drawn from basic facts. They may be properly regarded as findings of fact which this court ought not to disregard. In any event, we accept the Chancellor's conclusions, and with him hold that PSB did not divide or share the benefits of the license with PRT; that PRT, was not an agent, instrumentality, *alter ego* or sales department of PSB; and that royalty under the terms of the contract is calculable and payable on PSB's selling price to PRT, and not on the latter's selling price to its distributors.

Finally, there are certain errors assigned with respect to the exclusion of evidence sought to be elicited both on cross-examination and on direct examination concerning what apparatus was covered by patents under which PSB is licensed by RCA.

In the cross-examination of one of PSB's employees who gave evidence on its behalf, the witness was asked if a certain device, said to be one element of the cabinet, was patented. Objection was made that the inquiry was not within the scope of the examination in chief, and the objection was sustained. The same witness was shown a copy of a letter purporting to have been addressed to him by a patent attorney of RCA, and what appeared to be an original response of the witness thereto. The letters were said to be concerned with certain patented elements of the cabinet. Upon suggestion that the inquiries were not properly in cross-examination, but were a part of RCA's case in chief, the witness was, then and there, taken as a witness in chief for RCA. Upon his identification of the letters, they

were offered in evidence, and objection to the offer was sustained. No exceptions were taken to the rulings.

Notwithstanding, error is assigned. Since no exception was taken to the rulings on the evidence, the assignments of error relating thereto will not be considered. *Stephenson v. Commonwealth & Southern Corporation,* 19 *Del. Ch.* 447, 168 *A.* 211; *Dean v. State,* 2 *W. W. Harr.* (32 *Del.*) 469, 125 *A.* 478.

By other assignments of error abuse of legal discretion by the Chancellor is predicated upon his refusal to re-open the case to permit the introduction of testimony to show the nature and character of certain patents as an aid to the interpretation of the license agreement. In his opinion denying a re-hearing the Chancellor observed that the patent situation as an interpretive aid was not seriously advanced at any time by RCA; that the line of inquiry sought to be developed was referred to only twice and then in a casual way; and so foreign to the theory of RCA's case was the subject matter of the inquiry that when he ruled against it no exception was taken. He also observed that RCA had ample opportunity at the trial to show what it subsequently desired to show in a re-opening of the case; and that the application did not appeal to him for the reason that the case having been tried on one theory and the court's views thereon having been made known, the purpose of RCA was to re-open the case to see whether another theory might not be developed which supplementing the first theory, would not be more persuasive. (22 *Del. Ch.* 321).

The essence of judicial discretion is the exercise of judgment directed by conscience and reason, as opposed to capricious, or arbitrary action. Where a court has not exceeded the bounds of reason in view of all of the circumstances, and has not so ignored recognized rules of law or practice as to produce substantial injustice, its legal discretion has not been abused. 5 *C. J. S. Appeal and Error,*

*page* 475, § 1583; *Bringhurst v. Harkins,* 2 *W.W. Harr.* (32 *Del.*) 324, 122 *A.* 783; *In re Missouri-Kansas Pipe Line Co., ante p.* 215, 2 *A.* 2d 273. The question is not whether the reviewing court agrees with the court below, but rather whether it believes that the judicial mind, in view of the relevant rules of law and on due consideration of the facts and circumstances of the case, could reasonably have reached the conclusion of which complaint is made.

Considered as a motion for a new trial on the ground of after discovered evidence, the motion of course must have failed. *In re Missouri-Kansas Pipe Line Co., supra.* As an attempt to retry the case on a different theory, the motion had no merit. The appellant insists that it did not press its offer of proof of patented articles at the trial, because it was content to rest upon the contract as it was written; but, the Chancellor, as it contends, having changed his mind with respect to the materiality of the evidence which he had excluded, proceeded to make assumptions as to the scope of the patents not only contrary to what the evidence would have shown, but also for which there was no basis in the record. In brief, the appellant contends that the Chancellor did not construe the contract as it was written.

The contention results in this: The Chancellor, having construed the contract contrary to the appellant's contention, is said to have abused his judicial discretion in refusing the appellants an opportunity to introduce evidence upon which a different interpretation might be predicated.

We are satisfied that, in view of the issues of the case as presented to the Chancellor, he did not abuse his discretion in declining to re-open the case; and, consequently, the assignment of error in this respect must fail.

The decree of the court below is sustained.