**COCA–COLA BOTTLING COMPANY OF ELIZABETHTOWN, INC., et al., Plaintiffs,**

v.

**The COCA–COLA COMPANY, Defendant.**

**Civ. A. No. 81–48 MMS.**

United States District Court, D. Delaware.

Aug. 8, 1986.

---

Edmund N. Carpenter II, Charles F. Richards, Jr., Jesse A. Finkelstein, of Richards, Layton & Finger, Wilmington, Del.; Emmet J. Bondurant and Jane V. Vehko, of Bondurant, Mixson & Elmore, Atlanta, Ga.; J. Barry Epperson, of Epperson, Goodpaster & Johnston, Tulsa, Okl.; M.B. Jackson, of MacDonald, Halsted & Laybourne, Los Angeles, Cal., of counsel, for plaintiffs and intervenors.

Andrew B. Kirkpatrick, Jr., William O. LaMotte, III, and Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del.; Griffin B. Bell, Frank C. Jones, Chilton Davis Varner and Dwight J. Davis, of King & Spalding, Atlanta, Ga., of counsel, for defendant.

## MEMORANDUM OPINION

MURRAY M. SCHWARTZ, Chief Judge.

This class action for declaratory, injunctive, and monetary relief was brought against The Coca-Cola Company ("the Company") by Coca-Cola Bottling Company of Elizabethtown, Inc. on behalf of itself and other unamended first-line Coca-Cola bottlers in the United States.[1] By Order dated

---

1. Plaintiffs are known as "unamended bottlers" because they continue to operate under perpet-

April 12, 1983 (Dkt. 155), 95 F.R.D. 168, as amended on April 27, 1983, 98 F.R.D. 254, (Dkt. 157), the Court certified two issues for determination and severed those issues for separate trial pursuant to Fed.R.Civ.P. 42(b). Those issues are: (1) the meaning of the term "sugar" as used in Paragraph 10 of two identical 1921 Consent Decrees, including whether the word "sugar" as used in that paragraph encompasses High Fructose Corn Syrup–55 ("HFCS–55"), and (2) the meaning of the term "market price" as used in paragraph 7 of those Decrees.

Paragraph 10 of the Consent Decrees provides:

> The party of the second part [The Coca-Cola Company] contracts that the syrup sold and furnished by it to the party of the first part [the parent bottler] is to be high grade standard Bottlers Coca-Cola Syrup, and shall contain not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup.

Paragraph 7 of the Consent Decrees reads:

ual contracts, based upon 1921 Consent Decrees, rather than under a 1978 Amendment which other Coca-Cola bottlers ("amended bottlers") have executed.

2. Other relevant provisions of the Consent Decrees are paragraphs 5 and 6:

> 5. The parties hereto hereby raise the contract price of Coca-Cola Bottlers Syrup as fixed by said existing contract to one dollar and seventeen and a half cents ($1.17½) per gallon delivered as heretofore, including five cents (5¢) per gallon for advertising matter to be delivered at actual cost and freight expenses, and said party of the first part is hereby relieved and discharged from any and all obligations to spend anything for advertising; but it shall be bound to sell and deliver, at such actual cost, the same amount of advertising matter delivered to it by the party of the second part, to the actual Bottlers, as herein provided for. The party of the first part furthermore agrees to pay an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance; same to include all possible increases in the cost of producing such syrup by the party of the second part other than may arise under, and

It is agreed between the parties that the price of sugar is to be determined quarterly, January, April, July and October in each year, by averaging the market price of standard granulated sugar during the first week in such quarter, as quoted at the refineries by the ten refineries operating in the United States of America at the time, having the largest capacity and output.[2]

PX 4; PX 5.

Since January, 1980, the Company has sweetened CocaCola with High Fructose Corn Syrup–55 ("HFCS–55").[3] Plaintiffs assert the term "sugar" as used in the Decrees means refined granulated sugar, i.e., sucrose. They contend that HFCS–55 is not "sugar" as that term is used in the 1921 Consent Decrees and that the Company is violating Paragraph 10 of those Decrees by using HFCS–55 in Coca-Cola Bottlers Syrup without their consent. The Coca-Cola Company argues "sugar" as used in paragraph 10 is a generic name for a family of complex carbohydrates which includes not only sucrose, but also fructose and glucose. Based on this interpretation,

> as provided for by the arbitration clauses herein.
>
> 6. In order to promote the sale of Coca-Cola and enable the actual bottlers to compete with other beverages, the party of the first part hereby agrees to sell such syrup to the bottlers purchasing from it at not exceeding one dollar and thirty cents ($1.30) per gallon, including five cents (5¢) per gallon for advertising matter to be delivered, and an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance; the party of the first part hereby further agrees that any increase in price or change in terms growing out of any agreement or arbitration as provided under paragraph three hereof shall not be exceeded or increased by it in any sales it may make of said syrup to the bottlers purchasing the same from it.

PX 4; PX 5.

3. High Fructose Corn Syrup is a clear, sweet viscous liquid produced from cornstarch and composed of fructose, glucose, and oligosaccharides. Tr. 360–69 (Sequira). HFCS–55 contains 55% fructose. *Id.* at 369. The substitution of HFCS–55 for sucrose does not adversely affect the quality of the Coca-Cola product. Tr. 3218–19 (Schmidt); DX 592.

the Company insists it has the right to use HFCS–55 in Cola-Cola Bottlers Syrup without the bottlers' consent.

The second issue in dispute between the unamended bottlers and The Cola-Cola Company involves the meaning of the term "market price" of sugar as used in paragraph 7 of the 1921 Consent Decrees. Plaintiffs contend for purposes of paragraph 7 that market price is the average of the actual selling prices of the basis grade of refined granulated sugar being charged f.o.b. the ten largest refineries in the United States on sugar sold in wholesale lots for prompt shipment to industrial users during the first seven days of each calendar quarter, after the deduction of any rebates, discounts, or allowances (other than a two percent cash discount).

Defendant counters "market price" means the publicly quoted or "list" prices announced by refiners to the entire trade prior to sale before any rebates, discounts, or allowances are negotiated by an individual purchaser. The Company has not restricted its definition to only those prices reflected on a published list; it has instead used the term more broadly to include those prices publicly quoted to the trade at large prior to sale, *i.e.*, the price that would be published in a price list if the refiner issued a current price list at that given moment.

The certified issues were tried by the Court between May 19 and June 13, 1986, without a jury, generating over 3400 pages of trial transcript. Testimony was given by fourteen witnesses, either through live testimony or by deposition. During the course of the trial plaintiffs tendered one thousand and forty-nine documentary exhibits; the Company tendered six hundred and forty-nine.[4]

The Court concludes: (1) "sugar" for purposes of paragraph 10 means refined granulated sugar from cane or beet, and therefore HFCS–55 is not sugar as that term is used in paragraph 10 of the 1921

Consent Decrees, and (2) for purposes of paragraph 7 the "market price" of sugar means an average of the price per pound for refined granulated sugar of the grade and in the packaging unit in which it is principally sold to industrial users f.o.b. the refinery, as made known to such industrial users upon inquiry prior to sale by the ten refineries in the United States with the largest capacity and output during the first seven days of each calendar quarter, less any discounts, allowances, or rebates from that price which are available to industrial users or are made known to them upon inquiry prior to sale, but not including a standard two percent cash discount or any individually negotiated discounts, allowances, or rebates.

## I. *Background Facts*

Much of the historical background of the contractual relationship between The Coca-Cola Company and the bottlers of Coca-Cola is summarized in the 1920 opinion of the Court, *Coca-Cola Bottling Co. v. The Coca-Cola Co.*, 269 Fed. 796 (D.Del.1920), and in other opinions of this Court, *Coca-Cola Bottling Co. of Elizabethtown, Inc. v. The Coca-Cola Co.*, 95 F.R.D. 168 (D.Del.1982); *Coca-Cola Bottling Co. of Elizabethtown, Inc. v. The Coca-Cola Company*, 98 F.R.D. 254 (D.Del.1983). Some of that background is repeated here because it aids in understanding the resolution of the present controversy.

In 1892 The Coca-Cola Company was formed to market fountain syrup. Dkt. 334 (Pretrial Order, Admitted Facts) ¶ 6 (hereinafter "Admitted Facts ¶ ——"). The Coca-Cola bottling system began in 1899. On July 21 of that year Asa Candler, then president of The Coca-Cola Company, executed on behalf of The Coca-Cola Company a contract granting B.F. Thomas and J.B. Whitehead the exclusive right to engage in the business of bottling and selling Coca-Cola throughout all but eight of the United States. The contract obligated the Compa-

---

**4.** The trial did not include consideration of issues and defenses peculiar to individual bottlers nor construction of the actual bottlers' contracts (as opposed to the Decrees). Discovery and trial of these matters were stayed pursuant to an Order of April 12, 1983. (Dkt. 155).

ny to sell Thomas and Whitehead their requirements of Coca-Cola syrup at a fixed price. Admitted Facts ¶¶ 9, 10, 11, 12.

In 1900 Thomas and Whitehead divided the territory between them. Admitted Facts ¶ 16. Thomas named his bottling company "Coca-Cola Bottling Company" ("the Thomas Company"). Admitted Facts ¶ 18. Whitehead and his new partner J.T. Lupton entitled their bottling company "*The* Coca-Cola Bottling Company" ("the Whitehead-Lupton Company"). Admitted Facts ¶¶ 17, 19. These two companies became the primary "parent" bottlers.

The two companies developed their respective geographic areas independently. They each contracted with local businessmen ("actual bottlers" or "first-line bottlers") who built bottling plants, developed the market for bottled Coca-Cola, and sold Coca-Cola to customers in their exclusive territory. Admitted Facts ¶¶ 16–20, 24. The Thomas Company granted to its actual bottlers term contracts for two years, Admitted Facts ¶ 26; the Whitehead-Lupton Company granted contracts with no time limitation. Admitted Facts ¶ 105. In 1920 there were more than 300 bottlers in the Thomas Territory, Admitted Facts ¶ 26, and approximately 800 in the original Whitehead-Lupton territory. Admitted Facts ¶ 25. The parents neither manufactured or transported the syrup nor bottled the final product, *The Coca-Cola Bottling Co. v. The Coca-Cola Co.*, 269 Fed. at 801, 811–12; Admitted Facts ¶ 23; that was exclusively left to the actual bottlers.

Under the terms of the parent bottlers' contract, the Company agreed to sell the parents their requirements of Coca-Cola Bottlers Syrup at a fixed price. The agreement also required that the "Coca-Cola syrup . . . be used in proportions of not less than one ounce of syrup to eight ounces of water." Admitted Facts ¶ 12.

Refined granulated sugar was the principal and most expensive ingredient used in the manufacture of Coca-Cola syrup. PX 766 (AZ0605, AZ0609, AZ0610, AZ0611). The price of sugar had been in the range of 4.9 cents in 1899 when the contract was originally executed and 4.65 cents in 1907 when the fixed price of syrup had last been amended. PX 312. World War I severely affected the price and supply of sugar. Only the imposition of rigid price controls held the price of refined sugar at 9 cents per pound. Admitted Facts ¶ 50. After termination of federal price controls of sugar in September 1919, prices rose rapidly until they exceeded 23 cents per pound in May-June 1920. Admitted Facts ¶ 55.

During the war years, sugar purchasers were assigned quotas under which they were allowed to buy only 50 percent of their sugar purchases made during a previous base period. Admitted Facts ¶ 49. The Company responded by reducing the quantity of sugar used to sweeten Coca-Cola Bottlers Syrup, and by using sweeteners other than cane sugar. Admitted Facts ¶ 53.

In addition to reducing the quantity of its most expensive ingredient in Coca-Cola Bottlers Syrup, the Company sought price relief from the parent bottlers. In 1917 the parent bottlers voluntarily agreed to a temporary increase in the price of syrup to 97 cents per gallon because of the increase in the cost of sugar caused by the war. Admitted Facts ¶ 52.

In November 1919, at the request of The Coca-Cola Company, the parent bottlers again agreed to a temporary price increase. Under this temporary agreement, which was to expire in February 1920, the parent bottlers agreed to pay the additional costs of manufacture for sugar purchased above 9 cents per pound, up to a maximum syrup price of $1.45 per gallon. At the Company's request, this temporary agreement was extended until March 1, 1920. Admitted Facts ¶¶ 56, 62. This agreement represented the first time the parties established a fluctuating price of syrup based upon the actual cost of any ingredient.

Early 1920 witnessed the virtual disintegration of the previous harmonious relationship between The Coca-Cola Company and the parent bottlers. In its stead there developed a business relationship characterized by animosity, distrust, and hostility.

In January 1920, sobered by the inflation during World War I and its aftermath, The Coca-Cola Company sought to relieve itself of the basic fixed-price contract with the parent bottlers, under which it was operating but for the temporary amendments. It proposed a fluctuating price tied to the total cost of production of Coca-Cola Bottlers Syrup. Admitted Facts ¶ 58; DX 47; PX 309; PX 1 (*Coca-Cola Bottling Co. v. The Coca-Cola Co.*, 269 Fed. 796 (D.Del. 1920), Transcript of Record at 2215–19 (hereinafter cited as "R. ——")). The parents cancelled a scheduled meeting on the Company's 1920 proposal, stating they would not negotiate an amendment without definite, specific information as to the cost of manufacture. They conditioned the making of a counterproposal upon The Coca-Cola Company's willingness to furnish a statement of the cost per gallon of manufacturing the syrup, so itemized that the parents could verify its correctness. Admitted Facts ¶ 59; DX 57.

The Company responded by announcing that it regarded the parents' contracts as terminable at will. Admitted Facts ¶ 60; PX 1 (R.2858). Further discussions floundered over the accuracy of the cost information provided by the Company's accountants. Admitted Facts ¶¶ 59, 61; DX 55; DX 58.

The parties eventually agreed to extend the temporary amendment, which provided for a pass-through of actual sugar costs above 9 cents per pound, while their representatives conducted negotiations. Admitted Facts ¶ 62; DX 59; PX 1 (R.1097–98). On February 11, 1920, the representatives submitted a joint report to the Company and to the parent bottlers. Their recommendation was as follows: the Company would acknowledge the contracts with the parent bottlers were perpetual; there would be a base price for syrup which would be priced according to the actual total cost incurred in manufacturing the syrup plus equal profits for the Company and the bottlers; and the bottlers' desire for verification would be served by placing the proportions of the various ingredients in a sealed envelope to be left with a representative of the parent bottlers and to be opened in the case of a dispute. Admitted Facts ¶ 63; DX 64.

Although the parents were willing to accept the proposal, Admitted Facts ¶ 64, the Company rejected it, asserting: (a) the base price stipulated in the proposal was too low; (b) the profit to the parents was too great; and (c) the Company should not have to disclose the proportions of the ingredients in the formula for Coca-Cola. Admitted Facts ¶ 65; DX 66. The Company countered with its own proposal of reduced profits for the parents and a straight adjustment for variations in the total cost of manufacture of syrup. As for verification, the Company agreed only to produce an audited statement from its accountants, stating that "the integrity and good faith of The Coca-Cola Company must be relied upon...." Admitted Facts ¶ 65; PX 1 (R.1579); DX 66.

Thereafter the Company rejected a parent's proposal that it acknowledge the perpetuity of the parents' contracts and withdraw its threats to terminate the contracts at will, PX 1 (R.72), in exchange for an extension of the 1919 temporary amendment. The parent bottlers responded on February 27, 1920 by notifying the Company that all negotiations were terminated, and that all temporary arrangements were cancelled as of March 1, 1920. After that date the parent bottlers demanded the Company carry out all aspects of its permanent fixed-price contracts with the parent bottlers, which were based on the 1907 price of sugar. Admitted Facts ¶ 66.

After notifying the bottlers on March 2, 1920 that their contracts "will stand terminated on May 1, 1920," Admitted Facts ¶ 67; PX 343; PX 344, the Company on April 1, 1920 submitted a final settlement proposal. The Company offered to appoint the parents as agents and distributors, entitled to a royalty on each gallon distributed. Again the Company proposed a cost-plus arrangement, with the price to be adjusted semi-annually based on a sworn statement from the Treasurer of the Company itemiz-

ing specific elements of the Company's costs. Admitted Facts ¶ 69; DX 67. The parents rejected this offer. Admitted Facts ¶ 70; PX 368; PX 369.

Faced with contract termination, on April 13, 1920, the two principal parent bottlers filed suit in Georgia state court seeking to enjoin the Company from terminating their contracts. Admitted Facts ¶ 72. Six actual bottlers intervened as plaintiffs. Admitted Facts ¶ 74. The Georgia suits were voluntarily dismissed on May 30, 1920, and were refiled on June 1, 1920, in the United States District Court in Delaware. *Coca-Cola Bottling Co., v. The Coca-Cola Co.,* D.Del. Case No. 388, PX 1 (R.5); *The Coca-Cola Bottling Co., v. The Coca-Cola Co.,* D.Del. Case No. 389. PX 1 (R.5). The same first-line bottlers who had intervened in the Georgia cases intervened in the cases in this Court. PX 1 (R.80, 93).

On June 10, 1920, the parties to the Delaware litigation agreed to entry of an order requiring the Company to supply the parent bottlers' and actual bottlers' requirements of Coca-Cola Bottlers Syrup during the pendency of the litigation. Under the terms of the Order, the price of the syrup paid by the actual bottlers to the parent bottlers was fixed at $1.72 per gallon for 5 months (until November 1, 1920), by which time it was anticipated a final decision on the applications for interlocutory injunctions would have been rendered. The Order further provided that if the final decision had not issued by November 1, 1920, the syrup price would be increased or decreased from the $1.72 level based upon increases or decreases in the Company's actual costs of manufacture of the syrup. Admitted Facts ¶ 77.

During the negotiations leading to the June 10 Order, it appears the Company failed to disclose fully that it had entered into substantial long-term sugar contracts at prices near the top of the market. The bottlers were given to understand, from representations made in an affidavit filed on June 7, 1920 by Charles H. Candler, then Chairman of the Board of The Coca-Cola Company, that the Company had fa-

vorable long-term sugar contracts "very much lower than the present market price." PX 1 (R.1608). Charles Rainwater, in a letter to Candler dated January 14, 1921, recollected Candler's statements to the bottlers:

> [Y]ou represented that The Coca-Cola Company had but one written contract, which expired in about three weeks, and one verbal contract, under which the market price each Monday morning was controlling.

DX 105. *See also* DX 81 (Letter from J.B. Sizer, attorney for actual bottlers, to Crawford Johnson, Vice-President, Coca-Cola Bottlers' Ass'n (Oct. 18, 1920)) (summarizing bottlers' discussions leading to entry of June 10 Order); DX 87 (Letter from J.B. Sizer to Carl Rainwater, Secretary and Treasurer, Whitehead-Lupton Co. (Nov. 1, 1910)).

Although the price of sugar dropped steadily from its peak in June, 1920, PX 311, *see* PX 449, the price of syrup to the parent and actual bottlers under the June 10, 1920 Order remained fixed. Thus, while competing soft-drink prices fell, PX 457, PX 461, PX 462, PX 520, PX 530, PX 557, the retail price of Coca-Cola remained high. PX 457, PX 485. Actual bottlers suffered a loss in sales volume. PX 457; PX 520; PX 530. The Chairman of The Coca-Cola Company reported that the Company's total sales volume of syrup (which included both bottle and fountain syrup) declined 53% in September, 1920 and 50% in October, 1920, because of the high price of syrup. PX 485; Admitted Facts ¶ 81.

The bottlers expected relief on November 1, based on their understanding of the Company's sugar contracts. Instead, with the market price of sugar continuing to fall, PX 311, PX 556, the Company announced a price increase for its syrup in November, 1920, Admitted Facts ¶ 80; PX 470, in order to recoup the cost of its inventories of high-priced sugar. *See* PX 517; PX 542; PX 573. The Company also announced price increases in December, 1920, DX 95, and January, 1921. Admitted Facts ¶ 87; DX 107; DX 108; DX 110. The

bottlers by agreeing in the June 10 Order to a price for syrup based upon the Company's total manufacturing cost quickly discovered they had unwittingly exposed themselves to and insulated the Company from the hazards of the marketplace. The Company required the bottlers to pay for the Company's poor judgment in overpurchasing high-priced sugar, while it continued to receive fixed profits per gallon of syrup. Both The Coca-Cola Company and especially the actual bottlers found themselves in a precarious economic position while maintaining an increasingly antagonistic negotiating posture.

The Company represented its costs of manufacture under the June 10 Order had increased because of long-term sugar contracts at high prices. The parent bottlers, in disbelief, demanded verification of the Company's figures. Admitted Facts ¶ 88. The bottlers' audit revealed discrepancies, *see* DX 105, and the Company and the parent bottlers were unable to reconcile their figures or even agree on items of overhead to be included in the cost calculation. DX 111. When the Company in January 1921 announced an estimated February cost of manufacture of $1.85, DX 112, the bottlers took new action. In February, a parent bottler and actual bottlers filed supplemental complaints accusing the Company of fraud in the negotiation of and operation under the Order and sought appointment of a special master to determine the syrup cost under the terms of the Order. Admitted Facts ¶ 93.

Prior to the filing of their Supplemental Complaint, the bottlers' litigation and bargaining posture had been strengthened. On November 8, 1920, the District Court granted the parent bottlers' motions for preliminary injunctions and enjoined The Coca-Cola Company from terminating the 1899 contract with the parent bottlers. *Coca-Cola Bottling Co., v. The Coca-Cola Co.,* 269 Fed. 796 (D.Del.1920). The Coca-Cola Company appealed this ruling to the United States Court of Appeals for the Third Circuit. Admitted Facts ¶ 82. Although there would be no ruling because the parties were destined to settle, it was the bottlers' perception that the argument went very well for them. PX 601.

Beginning in November 1920, settlement negotiations ensued. Admitted Facts ¶ 83. On June 24, 1921, the Company and the parent bottlers executed a Memorandum of Settlement. Admitted Facts ¶ 96. During July, 1921, The Coca-Cola Company entered into settlement agreements with the parent bottlers. These agreements were entered as Final Decrees of the United States District Court in Delaware in Case Nos. 388 and 389 on October 4, 1921. PX 4; PX 5; Admitted Facts ¶ 97.

Between 1923 and 1975 the Company acquired all parent bottlers and assumed their rights and obligations to the actual bottlers. Among the rights assumed was the Thomas Company's right to participate with the Company in the fixing of the market price of sugar. PX 33; PX 779 ¶ Fourth (d). Admitted Facts ¶ 111; *see also Coca-Cola Bottling Co. v. The Coca-Cola Co.,* 98 F.R.D. 254, 261 (D.Del.1983).

In the late 1970s, more than five decades after the 1921 litigation was settled, the Company sought price relief from the pricing provisions of its bottling contracts with the actual bottlers, which were based on the 1921 Decrees. The Company commenced negotiations for amendments that would permit more flexible pricing in its contracts with all actual bottlers by partially severing the link between the price of syrup and the price of sugar. DX 492. The Amendment as eventually drafted created a new formula for pricing syrup using a "Sugar Element," a "Base Element," and the Consumer Price Index. PX 880; Tr. 2035–36, 2040–42 (Blanchard). The 1978 Amendment also contained a provision that in the event the Company modified the formula of Coca-Cola Bottlers Syrup to replace sugar with "another sweetening ingredient," the resulting savings would be passed through to amending bottlers. PX 880 ¶ 1(c).

The vast majority of bottlers signed the Amendment. The 42 actual bottlers identified as plaintiff-intervenors at the time of trial of this matter all declined to amend

their contracts. Complaint ¶ 35. These unamended bottlers have continued to operate under bottlers' contracts essentially unchanged (for purposes of this litigation) from the agreements reached in 1921. Complaint ¶ 32; *see* 98 F.R.D. at 261.

In January, 1980, the Company announced it would sweeten Coca-Cola Bottlers Syrup with a mixture of 50 percent HFCS–55 and 50 percent sucrose, PX 909, and eventually 100 percent HFCS–55. Syrup sweetened in this manner was sold thereafter to all bottlers, including unamended bottlers. PX 906; PX 903.

The Company continues to price Bottlers Syrup to unamended bottlers in what it argues is full compliance with Paragraph 7 of the unamended contracts and the 1921 Consent Decrees, using the prices quoted by refiners for granulated cane sugar by the eight largest cane refineries during the first seven days of each calendar quarter. Tr. 2755–58 (Konzal).[5] The Company prices Bottlers Syrup to amended bottlers in accord with the amended contract, passing through the savings achieved by the use of HFCS–55. Tr. 2110–27 (Blanchard); 3239–45, 3278 (Schmidt). Even with those savings, amended bottlers have paid more for their syrup than non-amenders in each quarter since the Amendment became effective because of the revised price formula. Tr. 3228–3262 (Schmidt); DX 646; DX 647; DX 649.

Plaintiffs filed this litigation in February, 1981, within one year of the Company's refusal to comply with the bottlers' demands that the Company either comply with paragraph 10 of the 1921 Consent Decrees by supplying the unamended bottlers with Coca-Cola Bottlers Syrup that contains not less than 5.32 pounds of sugar or pass on the savings from its use of high fructose corn syrup as a sugar substitute.

## II. *Governing Law*

### A. *Standing*

The Coca-Cola Company has raised a threshold issue of whether the bottlers have standing to enforce the 1921 Consent Decrees. This issue does not touch upon the question of constitutional standing, *see Allen v. Wright,* 468 U.S. 737, 750–51, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (doctrine of standing derives from Article III requirement that federal courts may adjudicate only actual "cases" and "controversies"), but is here interposed in the nature of a contractual defense. The 26 bottlers in the former Whitehead-Lupton territories claim standing to enforce the Consent Decrees as members of the class of intervening bottlers in the 1920 litigation. The 18 bottlers in the former Thomas territories assert standing because their interests were represented by the intervening bottlers, whose litigation fees they helped pay. All of the plaintiffs also claim standing as third-party beneficiaries of the 1921 Consent Decrees.

Defendant disputes the third-party-beneficiaries argument, and further contends the Thomas bottlers have no standing to challenge the determination of "market price" because their contracts contain an express provision reserving determination of market price to the Company and the Thomas Company (which was acquired by the Company in 1975). PX 33 ¶ Fourth (d); PX 779 ¶ Fourth (d) ("the fixing of that market price shall be as determined by the party of the first part [the Thomas Company] and The Coco-Cola Company").

None of these standing issues should be addressed at this time, for the question before the Court is the proper interpretation of certain terms found in the Consent Decrees. The issues of breach and damages with respect to the individual contracts have been severed for separate discovery and trial. The question of each plaintiff's ability to sue for enforcement of their rights is properly reserved until the individual contracts are at issue.

### B. *Law Applicable to the Construction of Consent Decrees*

■ The litigants are in virtual agreement on the general principles of law gov-

5. The Company uses eight cane refiners, instead of the ten called for by paragraph 7, *see supra* p. 1390, because there are now only eight cane refiners operating in the United States. Tr. 2755–58 (Konzal).

erning interpretation of consent decrees. Consent decrees have attributes of both judgments and contracts.

> While they are arrived at by negotiations between the parties ..., they are motivated by threatened or pending litigation and must be approved by the court.... Because of this dual character, consent decrees are treated as contracts for some purposes but not for others.

*United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37 n. 10, 95 S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1975). The Supreme Court has summarized the legal principles governing the interpretation of consent decrees:

> Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the "four corners" rule of [*United States v.*] *Armour* [*& Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)].

The most fundamental principle of contract construction is to ascertain the intent of the parties. *See, e.g., Coca-Cola Bottling Co. v. The Coca-Cola Co.*, 269 Fed. at 804. A court should consider the agreement as a whole, putting itself in the position of the parties. *Radio Corp. of Am. v. Philadelphia Storage Battery Co.*, 23 Del.Ch. 289, 6 A.2d 329, 334 (1939).[6] The first task is to look at the express terms of the contract itself. *Restatement (Second) of Contracts* § 203(b) (1981); *see also United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) (scope of consent decree to be discerned from "four corners" of document). A court may also look to other indicia of the parties' intent. These include the circumstances surrounding the making of the contract, the purpose of the parties, the course of performance under the contract, and trade usage. *Restatement (Second) of Contracts* § 202(1), (4). In applying these principles, a court must guard against inadvertently reforming a contract "under the guise of construction" by "looking too intently for· means of bringing about some ultimate good, thwarting an apparent wrong, or preventing hardship...." *Coca-Cola*, 269 Fed. at 805.

The parties are presumed to have used words according to their ordinary or "generally prevailing meaning," although "technical terms and words of art are given their technical meaning when used in transactions within their technical field." *Id.* § 202(3). In determining intent, a court is to give course of performance greater weight than prior course of dealing, and prior course of dealing greater weight than trade usage. *Id.* § 203(b).

Cognizant both of these rules of construction and of the antagonistic course of dealing which preceded the 1921 Consent Decrees, attention is now turned to ascertaining the meaning of "sugar" as used in paragraph 10 of the Consent Decrees and the meaning of "market price" as used in paragraph 7.

### III. *The Meaning of "Sugar" in Paragraph 10*

Paragraph 10 of the 1921 Consent Decrees reads as follows:

> 10. The party of the second part [the Company] contracts that the syrup sold and furnished by it to the party of the first part [the Parents] is to be high grade standard Bottlers Coca-Cola Syrup, and shall contain not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup.

PX 4; PX 5. At issue is the meaning of the term "sugar" as used in paragraph 10, and whether that definition includes HFCS–55. Dkt. 155 (Apr. 12, 1983 Order) (certifying issues).

---

**6.** The Court has held previously that claims arising directly from the 1921 Consent Decrees would appear to be governed by Delaware law.

*Coca-Cola*, 98 F.R.D. at 269 & n. 35. The principles of law applied here, however, are certainly not unique to Delaware.

Plaintiffs contend "sugar" as used in paragraph 10 means refined granulated sugar (sucrose). Dkt. 364 ¶ 261. HFCS–55 lies outside that definition. Defendant argues the term means any sugar of the generic class of sweet carbohydrates that meets the Company's high quality standards. Dkt. 362, at 3. Under that definition, HFCS–55 is "sugar."

The conflicting theories of each party are sufficiently plausible to require the Court to look beyond the face of the Consent Decrees. Having examined the text of the Consent Decrees, usage of the term "sugar" by the parties and in general commerce when the settlement was signed, the context of the settlement, the implicit purposes of the parties in paragraph 10, and post-settlement usage and course of performance, the Court finds the term "sugar" in paragraph 10 means refined granulated sucrose from cane or beets and does not include HFCS–55.

## A. *The Face of the Consent Decree*

The starting point in interpreting a contractual provision must be the face of the document itself. Although the term "sugar" is not explicitly defined in paragraph 10, the application of basic rules of construction to the face of the Consent Decrees strongly suggests that the term as used there means refined sugar from cane.

A contract should be interpreted as a whole. *Coca-Cola Bottling Co. v. Coca-Cola Co.*, 269 Fed. 796, 805 (D.Del.1920); *Restatement (Second) of Contracts* § 202(2) (1981). Words used in one sense in one part of a contract are presumed to have been used in the same sense in another part of the same document. *Radio Corp. of Am. v. Philadelphia Storage Battery Co.*, 23 Del.Ch. 289, 6 A.2d 329, 334 (1939); *Wyckoff v. Garrison*, 43 Del.Ch. 465, 237 A.2d 139, 142 (1967).

In the Consent Decrees, the term "sugar" is used without modification four times: once each in paragraphs 5, 6, 7, and 10. The more explicit phrase "standard granulated sugar" also appears in paragraph 7.[7] References in paragraph 7 to the market price of sugar at the ten largest "refineries" suggest the parties meant "refined granulated cane sugar" when they used the word "sugar." *See* Tr. 734–35 (Mount) (cane sugar refined at "refineries"), 2933 (Mount) (beet sugar refined by "processors"); Tr. 2794–96 (Konzal) (cane refinery; beet processing plant). There is no question the meaning of "sugar" in paragraphs 5, 6, and 7 is consistent. In claiming "sugar" in paragraph 10 has a much broader meaning, the Company must rebut the common-sense presumption that the same word in the same document means the same thing.[8]

## B. *Commercial Meaning of "Sugar" Before Settlement*

A presumption also exists that parties to a contract used words according to their

---

**7.** The Court finds the parties did not intend by using this phrase to limit the Company to the use of any particular grade of granulated sugar. The Company purchased various grades of granulated cane sugar, but primarily "fine granulated," both before and after entry of the 1921 Consent Decrees, *see* DX 7; DX 26; DX 46; DX 48; DX 51; DX 165; DX 237–40; DX 255; DX 385–86; DX 389; PX 117. The sugar refining industry did not then have definite standards for each grade, however. DX 251–54. Thus the Company has purchased "fine granulated," "standard fine granulated," and "standard granulated" sugar refined to its own specifications. *See, e.g.,* DX 237–40; DX 254; DX 255; DX 385–86; DX 388–89; DX 410; DX 411; DX 416; DX 418; DX 424; DX 551; DX 589; PX 711, at 45 (C.H. Candler autobiographical manuscript) ("We accordingly began the use of a standard granulated sugar which has been the grade of

sugar employed in manufacturing Coca-Cola ever since"); Tr. 745 (Mount). *See also* PX 830, at 2 (internal Company memorandum) (construing "standard granulated sugar" in 1921 settlement agreement as "the granulated sugar (fine granulated, extra-fine granulated, etc.) designated by the refiner as his standard base product in 1921, which carried the basis price."); PX 983.

**8.** Even if paragraph 10 is "unrelated" to paragraphs 5, 6, and 7, *see infra* pp. 1401–03, defendant must demonstrate the parties intended a different meaning for "sugar" in paragraph 10. The mere interpolation of paragraphs 8 and 9, dealing with trademark issues not directly related to paragraphs 5, 6, 7, or 10 and not mentioning "sugar," does not rebut the presumption.

ordinary meaning. *See ITT Continental,* 420 U.S. at 234–35, 95 S.Ct. at 933 (citing *United States v. Armour & Co.,* 402 U.S. 673, 678, 91 S.Ct. 1752, 1755, 29 L.Ed.2d 256 (1971) (language "taken in its natural sense"); *United States v. Atlantic Refining Co.,* 360 U.S. 19, 23, 79 S.Ct. 944, 946, 3 L.Ed.2d 1054 (1959) ("normal meaning"); *Hughes v. United States,* 342 U.S. 353, 356, 72 S.Ct. 306, 307, 96 L.Ed. 394 (1952) ("wording would make most persons believe")). *Restatement (Second) of Contracts* § 202(3)(a). The "ordinary meaning" of a word may differ, however, according to the context. Technical terms and words of art must be interpreted according to their usage in a trade when used among parties in that trade. *Radio Corp.,* 6 A.2d at 334; *Restatement* §§ 202(3)(b), 222.

The appropriate inquiry here, therefore, is the common meaning of "sugar" in the 1921 bottling trade.[9] In 1921 the industry knew "sugar" could refer to more than sucrose. *See* DX 12 (Nat'l Bottlers' Gazette, Feb. 5, 1918, at 71–73); DX 32 (Nat'l Bottlers' Gazette, Feb. 5, 1919, at 108). The broad chemical definition was not commonly used in the trade, however. *See, e.g.,* DX 12, at 71 ("Sugar is really a sort of family name—which is not the popular idea."). Sucrose was the preferred sweetener and was "the familiar sugar of commerce." Tr. 1776, 1777 (Shallenberger).

Government regulations rationing sugar during World War I defined "sugar" as "the manufactured product, 'sucrose,'" PX 137. This definition included refined cane and beet sugar, *id.,* and excluded molasses, corn syrup, grape sugar, cerelose, maple sugar, and refiners' syrups. PX 150. Various industry and government publications discussed the use of sugars including corn syrup, corn sugar, maltose syrup, honey, and refiners' syrup as "sugar substitutes" for "ordinary sugar." *See, e.g.,* DX 12; DX 15; DX 16 (Nat'l Bottlers' Gazette series, "Sugar Substitutes in Bottled Soft Drinks"); PX 145; PX 146; PX 147; PX 149; PX 151; PX 152; PX 153; PX 154; PX 157; PX 160; PX 163 ("The very BEST Sugar Substitute is—CORN SIRUP [sic]."); PX 167; PX 190; PX 193; PX 194; PX 261; PX 262; PX 279; PX 439. Bottlers adding a substitute to sucrose were cautioned that federal law required them to clearly label their products as containing both "sugar" and the substitute.[10] *See, e.g.,* PX 153 (U.S. Dep't of Agriculture release); DX 12, at 73; DX 15; PX 146; PX 147; PX 152; PX 154; PX 160; PX 163; PX 190; PX 194; PX 279; PX 439.

The Court concludes the industry practice at that time was to use a modifier or specific term when referring to sugars other than sucrose. The 1921 bottling trade for the most part used "sugar" standing alone to refer to sucrose from cane or beet. *But see* DX 32 (defining "sucrose" as cane sugar).

The next question is whether the parties to the Consent Decrees were aware of this industry usage. It is reasonable to assume that businessmen in the soft-drink trade would receive publications and notices directed to the trade and would be aware of the common industry definition of "sugar." Several specific uncontroverted facts, however, make it unnecessary to rely entirely on this assumption. Many bottlers corresponded with the USDA regarding "sugar

---

**9.** Evidence that the lay definition of "sugar" does not include HFCS–55, or that the chemical definition does include HFCS–55 and that sucrose in an acid solution like Coca-Cola "inverts" to fructose and glucose, is useful only to the extent the parties were aware of and had adopted those understandings. Dictionary definitions, which span a broad range, likewise are themselves not very helpful.

**10.** Defendant objects that no federal regulation has ever expressly addressed the labelling of "sugar" in soft drinks. Dkt. 366, at 57, 78–81.

Whether a formal regulation exists, however, is not the issue. What is relevant is that the appropriate federal regulatory agency, like the trade itself, has indicated that "sugar" means sucrose.

The relevance of this should not be overemphasized, however. Labelling guidelines or regulations are intended to protect and inform consumers. Lay understandings and definitions may not correspond to actual industry usage, or the understanding of the parties to the Consent Decrees.

substitutes." *See infra* p. 1400. *See also* PX 707 and 708 (1922 correspondence between a congressman and bottler). A copy of the 1918 rationing regulation, which defined "sugar" as sucrose, was produced from the files of Harold Hirsch, general counsel for the Company at the time of the 1920 litigation. *See* Dkt. 364 ¶ 266; PX 137. Parent bottlers received notice of this regulation from the Company and forwarded it to the actual bottlers. PX 162. Also produced from the files of Harold Hirsch were a copy of the USDA labelling release, PX 153, and copies of articles cited earlier discussing sugar substitutes. PX 152; PX 194; PX 208; PX 209; PX 232. I conclude the parties to the Consent Decrees were aware of industry usage of the term "sugar" to refer to granulated sucrose.

### C. *Contemporaneous Usage by the Parties*

Industry usage does not control if the parties to the Consent Decrees had a different definition in mind with regard to the use of the term in paragraph 10.[11] While the industry may have referred to both cane sugar and beet sugar as "sugar," the parties clearly meant only cane sugar.

It is plain that the parties did not use the term "sugar" to refer to sugar derived from corn. Sucrose, and more particularly sucrose from cane, was the preferred sweetener in the industry. Tr. 1776–77 (Shallenberger) (sucrose); DX 22, at 86 (cane); DX 32, at 108 (cane). Substitute sweeteners used by the Company during the World War I period proved unsatisfactory. PX 189; PX 287; PX 708.

Many Coca-Cola bottlers corresponded with the U.S. Department of Agriculture regarding "sugar substitutes." *See, e.g.,* PX 179; PX 181; PX 182; PX 183; PX 184; PX 185; PX 203; PX 216. Among these bottlers was the Birmingham Coca-Cola Bottling Co., whose founder, Crawford Johnson, was Chairman of the Special Committee of the Coca-Cola Bottlers' Association and an intervenor in the 1920 litigation. PX 185; PX 198. In 1922, a bottler who was a member of the Coca-Cola Bottlers' Association "Executive Counsel" [sic] (*see* PX 584) likewise distinguished "sugar" from the "substitutes" suggested by the government during the war. PX 708. Charles H. Candler, former Company president and chairman of the board, stated in a manuscript autobiography that the Company was "not permitted to buy as much sugar as we needed" and referred to "corn syrup, glucose, invert sugar, etc." as "sugar substitutes." PX 711 at p. 64.

The same meaning was evident in documents relating to the 1920 litigation. *See* PX 462 (letter from J.B. Sizer, attorney for actual bottlers, concerning competitive impact on bottlers of the fall of "sugar" prices); PX 3 (intervenors' petition, citing "sugar" prices); PX 3 (Company's answer p. 3, referring to "market price of sugar suitable for the manufacture of COCA-COLA syrup").

Particularly persuasive is the apparent genesis of the requirement in paragraph 10 of "five and thirty two one-hundredths (5.32) pounds of sugar." The Third Affidavit of Charles H. Candler, filed in this Court on June 7, 1920, states:

Deponent says that during his connection with The Coca-Cola Company of Georgia it was part of his [Candler's] duty to keep himself informed as to the price of *granulated sugar;* that *sugar* is one of the main ingredients of Coca-Cola. . . .

Deponent says that it has been a part of his duty in manufacturing Coca-Cola to keep himself acquainted with the cost of manufacturing the same. Deponent says that fifty-one and one-half (51½%) per cent. by weight of each gallon of Coca-Cola is sugar, there being in each gallon of bottling Coca-Cola Syrup *five and thirty-two one-hundredths (5.32) pounds of sugar.*

---

**11.** The Court has already found the term "sugar" in paragraphs 5, 6, and 7 refers to refined sugar from cane, creating a presumption that the same meaning should be applied to "sugar" in paragraph 10. *See supra* pp. 1398–99.

PX 1 (R.1605–06) (emphasis added). In a settlement proposal dated February 5, 1921, Charles V. Rainwater, representing the parent bottlers, stated: "Our proposition is ... that the future price shall be on a sliding scale of the price of *sugar* alone figured upon the basis of *5.32 pounds of standard granulated sugar* to the gallon of syrup...." PX 557 (emphasis added). Paragraph 10 of the agreed-upon settlement provides the syrup "shall contain not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup." PX 4; PX 5.

Defendant has cited no documents contemporaneous with the negotiation or entry of the 1921 Consent Decrees in which any of the parties used the term "sugar" standing alone to refer to corn syrup, glucose, or any sweetener derived from corn. HFCS–55 was not yet developed.

While beet sugar was, like cane sugar, subject to rationing during the war and was often referred to as "sugar" in the trade, the Court finds the parties did not intend to include beet sugar within the meaning of "sugar" in paragraph 10. Sucrose processed from sugar beets was not an acceptable sweetener at that time because the refining procedure tended to allow certain impurities to remain which could cause bottle syrup to sour. *See* PX 741, at 4; *see also* DX 22, at 86; DX 24, at 74; PX 238. Granulated sucrose from sugar cane was therefore used by The Coca-Cola Company in the manufacture of Bottlers Syrup. PX 741, at 4.

While not controlling, the opinion of John M. Mount, a former Director of the Purchasing Department at the Company and Senior Vice-President upon his retirement in 1981, with regard to the term "sugar" in paragraph 10 is nonetheless instructive: "Sugar in 1921, I believe, as I have read part of the decrees, not having been there, probably meant to refer to sucrose produced from raw cane sugar at that time.... In my reading and interpretation, no, it

didn't ["refer in the context of 1921 to any corn sweetener"]. Tr. 221–22 (II Mount Dep. 265–66).

I conclude the parties used the terms "sugar" and "standard granulated sugar" interchangeably to refer to high quality granulated cane sugar, and did so in the Consent Decrees.[12]

### D. *History and Purpose of Consent Decrees*

The history and purpose of the 1921 Consent Decrees provide evidence consistent with the Court's finding that the parties used the term "sugar" in paragraph 10 to refer to granulated cane sugar. The Court rejects defendant's theory that paragraph 10 was intended solely as a quality control provision, and that therefore the term sugar was used in its broad generic sense. While paragraph 10 had a quality control objective, it was also intended to supplement the pricing provisions of paragraphs 5, 6, and 7.

Paragraph 10 does address quality control. The Company in that paragraph promises the syrup sold by it to parent bottlers will be "high grade standard Bottlers Coca-Cola Syrup, and shall contain not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup." PX 4; PX 5. Quality was addressed by the requirement of "high grade standard Bottlers Coca-Cola Syrup" and the requirement of at least 5.32 pounds of sugar. The Company's theory that quality control was the sole focus of paragraph 10, however, does not withstand scrutiny. It is highly improbable that parent bottlers concerned about quality would insist on a precise minimum amount of "sugar" but would be wholly indifferent to what sort of "sugar" is used. Moreover, there is no reason to assume at least 5.32 pounds of a substitute "sugar" would be needed to assure high quality Bottlers Syrup.

---

**12.** The Court rejects defendant's alternative inference that the parties carefully used the term "sugar" without modifiers in paragraph 10 to allow the Company more flexibility in selecting ingredients for Coca-Cola syrup. Dkt. 366, at 61–62. *See supra* p. 1398 ("sugar" used without modifiers four times); *infra* pp. 1398–1403 (purpose of ¶ 10).

Paragraph 10 is best explained as both a quality-control and price-protecting provision. As recounted earlier, *see supra* pages 1394–95, the actual bottlers suffered financially during the period when the price of Coca-Cola Bottlers Syrup was much higher than the syrup prices paid by their competitors. In addition, both the actual bottlers and the parent bottlers were antagonistic toward and distrustful of the Company. It is against this background of hostility and distrust that the parties drafted paragraph 6 of the Consent Decrees, which states in pertinent part that:

6. In order to promote the sale of Coca-Cola and enable the actual bottlers to compete with other beverages, the party of the first part [the parents] hereby agrees to sell such syrup to the bottlers purchasing from it at not exceeding one dollar and thirty cents ($1.30) per gallon, including five cents (5¢) per gallon for advertising matter to be delivered, and an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance. . . .

PX 4; PX 5.

The express competitive-pricing rationale recited in paragraph 6 for tying the price of syrup to the price of sugar at a six-to-one ratio [13] is undermined if the Company can use a cheaper sweetener but continue to employ the paragraph 6 pricing mechanism. The requirement of 5.32 pounds of sugar in paragraph 10 ensures the Company cannot evade the pricing provisions of paragraphs 5, 6, and 7, and increase the effective syrup price to the bottlers, by reducing the amount of sugar to less than 5.32 pounds *or* by using cheaper substitutes.[14]

Defendant argues that so long as the strength of the syrup is maintained, (*i.e.*, the cheaper sweetener is not an inferior sweetener), bottlers are not cheated of their bargain if the Company uses a cheaper sweetener. Defendant cites correspondence from J.B. Sizer, attorney for the actual bottlers, suggesting that the profits of the Company and the parent bottlers were "entirely immaterial" if the bottlers paid a price for syrup "that is not in excess, or greatly in excess, of the prices at which other soft drinks are sold." PX 581. *See also* PX 587; PX 601.

The short answer to defendant's argument, and the fact to which the Court must return, is that the 1921 Consent Decrees were premised on the use of granulated cane sugar as a sweetener. In light of the experience of the parties prior to the entry of the Decrees, as well as the strong bargaining position enjoyed by the bottlers after the decision of this Court and argument before the Court of Appeals,[15] the

---

**13.** The syrup price increase was rounded up from 5.32¢ to 6¢ per gallon to account for all increases in other syrup costs. *See* PX 4 ¶ 5; PX 5 ¶ 5 ("same to include all possible increases in the cost of producing such syrup," except increases subject to arbitration).

**14.** The bottlers were familiar with the use of cheaper sweeteners and variations in syrup strength. *See* Admitted Facts ¶¶ 37, 53 (use of substitutes including corn syrup, beet sugar, and invert sugar during World War I); PX 177, PX 189, PX 287, PX 708 (substitutes inferior); Admitted Facts ¶ 39 (1899 contract: one ounce syrup to eight ounces water; some contracts 1907–16: 89/100 ounce syrup "to each eight ounce bottle"); PX 105 at 32–34 (Charles H. Candler testimony in 1911: one ounce Bottlers Syrup to seven ounces water); Admitted Facts 57¶¶ 45–47 (1916 "Root bottle": one ounce syrup to five-and-one-half ounces water); PX 766 at 99 (1929 accountant's report: before World War I, 6.36 pounds sugar per gallon Bottlers Syrup);

DX 220 (report suggesting 5.97 pounds sugar per gallon Bottlers Syrup 1916–18). *See also* PX 1 (R. 902–03, 1243) (Company used saccharine until 1907).

The "Norit process," under development by the Company at the time of the Consent Decrees, produced a "water-white" syrup directly from raw sugar. PX 1 (R. 2261). The process was experimental, *id.* at 2262, and was apparently unsuccessful and never utilized. The Court cannot find actual use of the Norit process was contemplated by the parties to the settlement.

**15.** "[T]he *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." *ITT Continental,* 420 U.S. at 235–36, 95 S.Ct. at 933–34 (quoting *Armour,* 402 U.S. at 681–82, 91 S.Ct. at 1757) (emphasis in original).

Court finds it unlikely they would enter into an agreement that allowed the Company to exploit a cheaper sugar in the manufacture of Coca-Cola Bottlers Syrup but keep the price of that syrup tied to the price of granulated sugar.

Now that a fully acceptable substitute has been developed, and is being used in competing brands, it is in the interest of both the Company and the bottlers to use that substitute in place of sugar. The effect of paragraph 10's sugar requirement is to require the Company to secure the consent of the bottlers before that change is made. It is the task of the parties, not of this Court, to refashion the agreement to reflect new developments. *See Coca-Cola*, 269 Fed. at 805.

#### E. *Post–1921 Course of Performance and Usage*

The course of performance and usage of the parties since the entry of the Consent Decrees in 1921 are consistent with the conclusion that "sugar" was not meant to include HFCS–55.

#### 1. *Course of Performance*

Both plaintiffs and defendant cite examples of actions since the entry of the Consent Decrees. The Court concludes the course of performance between the parties has broadened the meaning of the term "sugar" in paragraph 10, but that meaning still does not encompass HFCS.

##### a. *Use of Beet Sugar*

After quality problems with beet sugar were solved in 1941, the Company began to use beet sugar in Bottlers Syrup. DX 641; Tr. 735–36 (Mount). The Company subsequently purchased roughly one-third of its sugar requirements from beet processors, a percentage based on the beet industry's share of the total United States sugar quota. Tr. 2819–20 (Konzal); DX 421. The price differential between cane and beet sugar was eliminated in 1967. Tr. 2796 (Konzal).

■ Bottlers have known about the Company's use of beet sugar for many years. Tr. 3210–11 (Schmidt) (since sometime after 1955, in 1960s or early 1970s); Tr. 3332–33 (Denny) (25 years). Because the use of beet sugar was not contemplated by the Consent Decrees, plaintiffs had the right to object to its use.[16] Their failure to do so has resulted in a waiver of that right.[17]

The beet-sugar waiver has not, however, thrown open the door to the use of any sweetener. Waiver is based upon intent, and that intent must clearly appear from the evidence. *George v. Frank A. Robino, Inc.*, 334 A.2d 223, 224 (Del.1975). *See also Billman v. V.I. Equities Corp.*, 743 F.2d 1021 (3d Cir.1984). In this case, there is no evidence the plaintiff-bottlers waived the right to object to the use of HFCS in place of sugar. In effect, the term "sugar" in the Consent Decrees now means granulated sugar from cane or beet.[18] That definition still excludes HFCS.

##### b. *Use of Liquid Sucrose*

Defendant asserts the Company's unchallenged use of "liquid sucrose" since the 1950s also demonstrates the term "sugar" in paragraph 10 should be broadly defined. The Court disagrees.

---

**16.** That cane sugar and beet sugar are indistinguishable when properly refined, PX 741, at 4; PX 1013, is not determinative. *See supra* pp. 1401–03 (quality control not sole purpose of paragraph 10). The parties to the Consent Decrees intended "sugar" to mean refined granulated cane sugar when they drafted the agreement and tied the price of syrup to refinery prices.

**17.** The Company's continued experimentation with various sweeteners after entry of the Consent Decrees neither violated the terms of the Decrees nor obligated bottlers to object in order to preserve their rights. Mere experimentation has no impact on the meaning of "sugar" in paragraph 10.

**18.** Plaintiffs claim that market prices quoted by beet processors should be included in the paragraph 7 calculation of "market price" if those processors are among the ten largest domestic sugar producers. The Court disagrees. Paragraph 7 expressly refers to "refineries." The Court will not reform that term to accommodate the bottlers' waiver with respect to beet sugar.

"Liquid sucrose" refers to a sucrose obtained by dissolving granulated sugar in water. Tr. 409 (Sequeira). It is immaterial for purposes of the Consent Decrees whether granulated sugar is in granular form or is dissolved in water. Liquid sucrose produced from granulated beet sugar, *see* Tr. 1812 (Cunningham), should be treated like dry granulated beet sugar under the Consent Decrees. Plaintiffs have waived an objection to beet sugar. *See supra* p. 1403. Liquid sucrose produced from cane sugar, on the other hand, must be regarded as dry granulated cane sugar and therefore satisfies the definition of "sugar" in paragraph 10.

In sum, the Company's use of liquid sucrose does not affect the meaning of "sugar" in paragraph 10.

### c. *Tolling*

"Tolling" is a practice in which the Company buys raw sugar and then hires a refiner to refine it. Tr. 2807 (Konzal). The Company uses this contractual arrangement with regard to most of its cane sugar. *Id.*

Defendant questions why tolling may be used to enhance the Company's profits but HFCS may not be used as a sweetener to achieve the same goal. Dkt. 365, at 6 n. 17. The plain answer lies in the terms of the Consent Decrees, which specify the "sugar" to be used in the syrup but say nothing with regard to the mechanics of purchasing that sugar. The parties clearly contemplated that the Company's actual costs could increase or decrease over the life of the Consent Decrees and that the Company's profits would vary with its acumen in the sugar market. They consciously chose to tie the cost of syrup to the average cost of sugar irrespective of how the Company purchased it. The practice of "tolling" is simply not relevant to paragraph 10.

### 2. *Usage*

The parties' usage of the term "sugar" since 1921 is consistent with the Court's finding that that term does not include HFCS-55.

### a. *In General*

Notwithstanding its chemical definition, "sugar" continues to mean sucrose in the trade. Tr. 1768 (Shallenberger). Donald A. Leslie, who was employed by the Company from 1933 to 1971, purchased sugar in the Purchasing Department from 1946 to 1969, and became Director of Purchasing and Company Vice-President, testified that "sugar" standing alone meant refined sugar from cane or beets and that the term "sugar" was never used within the Company during his tenure to refer to corn sweeteners, which were called "sweeteners." Tr. 810–11 (I Leslie Dep. 23). John M. Mount, who worked in the Purchasing Department from 1946 to 1981 and was Vice-President and Director of Purchasing from 1969 to 1981, testified that while the term "sucrose" was used when talking to "the technical people," "[t]he terminology in the trade was that if you spoke of refined sugar, it was refined sugar produced from cane or beets." Tr. 746 (I Mount Dep. 70). Stanley J. Konzal, who has worked in the Purchasing Department's Sweetener Section since joining the Company in the early 1960s and is now Assistant Director of Purchasing, acknowledged that "[a]s a matter of business dealings, from day-to-day, we are not going to be dealing with the terminology strictly in the technical terms" and that the trade "as a matter of convenience" used "HFCS" to mean HFCS and "sugar" to mean sugar from cane or beet. Tr. 2898–2901.

These working definitions were employed in Annual Reports of the Purchasing Department, which distinguished, and compared the prices of, "sugar" and "HFCS." PX 857 (1974); PX 864 (1975); PX 870 (1978); PX 887 (1979); PX 889 (1980). A March 1979 report by the Company's Corporate Technical Division, "Sweetener Policy for Coca-Cola," also used this terminology, recommending that bottlers be authorized to use "only sucrose (sugar), either granulated or liquid" and reporting favorable taste test results "from the substitution of second-generation high fructose corn syrup (HFCS-55) for sugar in Coca-

Cola...." PX 891, at 1. Numerous other internal Company memoranda likewise use "sugar" to refer to sucrose and "HFCS" to refer to HFCS. *See, e.g.,* PX 929 (sugar/HFCS usage and cost); PX 949 (same); PX 951 (same); PX 930 (price forecasts); PX 916 ("Report on Sugar Procurement—1980"); PX 898 ("Use of Sugar vs. HFCS"); PX 926 ("Sugar Purchase Program 1980–81"). Syrup price notices sent to bottlers also used the term "sugar" to refer to refined sucrose. *See* Tr. 1330–33 (I Blanchard Dep. 83–86) (understanding of Company Vice-President and Manager of Contractual Dep't); Tr. 1965–66 (Delauter) (understanding of bottler). *But see* DX 577 (June 8, 1979 memorandum from Roberto C. Goizueta to John Ogden, both senior officers, referring to "beet sugar," "cane sugar," and "this new sugar from corn" (HFCS)).

Defendant has cited no internal Company document or discussion prior to 1980 stating that the term "sugar" in paragraph 10 refers to anything but sucrose. *See also* Tr. 225 (I Blanchard Dep. 281) ("I am unaware of any such conversation."); Tr. 226–27 (I Susong Dep. 59, 62, 66). Defendant admits it had never prior to January 1, 1980 communicated to any parent bottler, actual bottler, or third party that the term "sugar" in paragraph 10 of the Consent Decrees or any first-line bottlers contract: is a generic term describing a wide variety of carbohydrates (as alleged in par. 31 of its Answer in this case); means any product other than sucrose; or includes any sweetener from corn. PX 981, 982 (Defendant's Confidential Responses to Plaintiffs' Second Interrogatories to Defendant, Nos. 8 & 9) ("The company is not presently aware of any such communication").[19]

### b. *Labelling*

Unlike the usage outlined in the previous section, the Company's usage in ingredient labelling is not probative. Upon the introduction of HFCS in allied lines in 1974, the Company decided to label it "corn sweetener." PX 862; *see also* PX 878. Plaintiffs contend this constitutes an admission by the Company that HFCS is not "sugar." At best, however, the labelling decision evinces the Company's recognition that the Food and Drug Administration does not regard HFCS as "sugar" for labelling purposes. The tenuous link between government labelling requirements and the scope of the term "sugar" in paragraph 10 of the Consent Decrees has already been noted. *See supra* note 10.

The Company's 1980 decision to label HFCS "sugar" when introduced in Coca-Cola, PX 903, at 2, and its subsequent decision in 1985, four years after the commencement of this lawsuit, to change the label to read "sucrose and/or high fructose corn syrup," is likewise unpersuasive.

### c. *1978 Amendment*

The Company's interpretation of and conduct under the 1978 Amendment to the first-line bottler's contract are persuasive evidence that the parties' understanding of the term "sugar" does not include HFCS–55.

The 1978 Amendment recites that it reflects a finding by the Company and the bottlers that it is "in their mutual best economic interest" to amend their previous contracts. PX 880. Under the Amendment, the syrup price is the sum of two components: the "Sugar Element" and the "Base Element." The Amendment specifies:

> In the event that the formula for Bottle Syrup is modified to replace sugar, in whole or in part, with another sweetening ingredient, the Company will modify the method for computing the Sugar Element in such a way as to give the Bottler the savings realized as a result of such modification through an appropriate objective quarterly measure of the market price of any such sweetening ingredient.

---

**19.** Defendant argues the Company had no reason to publicly declare its interpretation of the word "sugar" before 1980, because until then only sucrose met its high quality standards. Dkt. 366, at 69. The Company nevertheless referred to the other sweeteners with which it experimented as "sugar substitutes" or "another sweetener." A high-quality substitute remains a substitute, and does not become the material replaced.

The Sugar Element would continue to fluctuate in the manner described above for sugar.

*Id.* ¶ 1(c).

The Court finds the parties intended the term "sugar" in the 1978 Amendment to mean the sugar then used in Coca-Cola Bottlers Syrup: sucrose from cane or beet. *See* Tr. 2216, 2226, 2229 (Blanchard); Tr. 1965–67 (Delauter); *see also* PX 880 ¶ 1(b) (cane and beet sugar prices used to determine "Sugar Element"); PX 875, 883 (explanatory material) (bottlers to receive savings from any use of "non-sucrose sweetener").

In 1980, the Company began to use HFCS–55 in the manufacture of Coca-Cola Bottlers Syrup. PX 909. The Company passed through to the amending bottlers the savings realized through use of the substitute. PX 905; PX 906. By utilizing the pass-through provision of paragraph 1(c), the Company has conceded HFCS is not "sugar" but "another sweetening ingredient" for purposes of the Amendment. This contemporary understanding of the term "sugar" is consistent with and therefore supports the Court's conclusion that HFCS is not "sugar" for purposes of the 1921 Consent Decrees.

### F. *Conclusion: "Sugar" in Paragraph 10*

■ I conclude the parties to the settlement agreements that became the Consent Decrees intended the term "sugar" in paragraph 10 to mean refined granulated sucrose from cane. The use of sugar from beets violated the Consent Decrees, but the bottlers waived objection to that violation. Thus, the effective present meaning of the term "sugar" in paragraph 10 is refined granulated sucrose from cane or beet, a definition that excludes HFCS–55.

---

**20.** *See supra* note 2.

**21.** Paragraph 5 governs the price of syrup delivered by The Coca-Cola Company to the parent bottlers, *see supra* note 2, and paragraph 6 the price of syrup from the parents to the actual bottlers. Paragraph 5 provided the price would

### IV. *The Meaning of "Market Price" in Paragraph 7*

■ Paragraph 6 of the 1921 Consent Decrees [20] fixes the price of a gallon of Coca-Cola Bottlers Syrup at $1.30. The price is to increase by an additional six cents per gallon for every increase of one cent per pound in sugar above seven cents per pound, with the same proportions to apply for a fractional increase.[21] The formula for determining the price of sugar is set forth in paragraph 7, which reads:

> the price of sugar is to be determined quarterly, January, April, July and October in each year, by averaging the market price of standard granulated sugar during the first week in such quarter, as quoted at the refineries by the ten refineries operating in the United States of America at the time, having the largest capacity and output.

PX 4; PX 5.

It is plaintiffs' position that the parties to the 1921 Consent Decrees intended the term "market price" as used in paragraph 7 to be

> an average of the actual selling price of the basis grade of refined sugar being charged f.o.b. the refineries by the 10 largest sugar refineries in the United States on sugar sold in wholesale lots for prompt shipment to industrial users during the first seven days of each calendar quarter, after the deduction of any rebates, discounts, or allowances from the list price that were known to The Coca-Cola company (other than the standard 2% discount for cash or payment within seven days).

Dkt. 364 ¶ 34. Plaintiffs argue this intent is shown by examining: (1) the objective of the parties in drawing up the Consent Decrees; (2) the "ordinary meaning" of the term "market price"; (3) the parties' con-

---

be $1.175 per gallon, with an escalator clause identical to that in paragraph 6. Because The Coca-Cola Company has acquired all the parent bottlers, Admitted Facts ¶ 111, it is entitled to deal directly with the actual bottlers and charge the paragraph 6 price per gallon.

temporaneous usage of "market price"; and (4) the course of performance in computing the market price under the contract. Plaintiffs contend that to determine the market price, the Company has an obligation, every quarter, to seek information on actual selling prices directly from the refiners, from the Company's own broker, from the bottlers, and from its own negotiating experience in the relevant time period. Dkt. 370, at 94–95, 97 (Transcript of Oral Argument, July 23, 1986).

According to defendant, "market price" means the " 'quoted' or 'list' prices publicly announced by the refiners to the trade at large, without taking into account any rebates, discounts, or allowances which might be negotiated by the Coca-Cola Company or any other purchaser in a specific transaction." Dkt. 362 ¶ 81.[22] Defendant argues the bitter pre-settlement experience caused the bottlers to seek a verifiable price, and "list" or "quoted" prices were and are the only prices known to both parties; and, most tellingly, the parties have consistently used "list" or "quoted" prices in applying the market-price formula.

Plaintiffs acknowledge some sales take place at the "list" price, and to that extent it may be said the list price is an "actual selling price." The nub of this dispute, however, is what price should be used when sales occur below list. Defendant would use the official list price as the market price even if 99% of sales took place below list. Dkt. 370, at 126. Plaintiffs would have the Company use the lowest known selling price, regardless of whether it was a "list" price.

Neither of the interpretations urged by the parties is found merely by examining the words "market price . . . as quoted at the refineries" found in paragraph 7. Accordingly, the Court must look beyond the document itself in order to ascertain the intent of the parties as to the meaning of "market price."

## A. The Objective of the Parties to the 1921 Consent Decrees

Plaintiffs urge the only objective of the parties in including a pricing formula in the 1921 Consent Decrees was to ensure the bottlers received syrup at a competitive price. As plaintiffs point out, paragraph 6 of the Consent Decrees expressly states only one objective: "to promote the sale of Coca-Cola and enable the actual bottlers to compete with other beverages. . . ."[23] Defendant contends the objective was to set a mutually verifiable price. The Court finds that as a result of their experience under the June 10, 1920 consent order, the parent and first-line bottlers had both these objectives.

As recounted above, see supra pp. 1392–95, the bottlers' previously harmonious relationship with the Company had become extremely antagonistic and distrustful during 1920 and 1921 as the litigation continued. The price of Coca-Cola Bottlers Syrup was steadily increased, even as the price of sugar and of competing soft drinks fell. The first-line bottlers in particular were squeezed by higher syrup prices and declining sales volume. The bottlers saw the Company's mendacity and greed as the source of their economic distress.

The settlement discussions in late 1920 proceeded concurrently with the syrup price increases. In November 1920, the Company proposed the price of syrup be adjusted quarterly based on its total actual costs, as verified by a certified public accountant. Admitted Facts ¶ 85; DX 92. This was rejected. In February 1921, after another exchange of offers and shortly before the filing of the Supplemental Complaint, the parent bottlers proposed that syrup price should vary according to the "market price" of sugar alone. Admitted Facts ¶ 90.

Negotiations broke down, to resume later in the spring of 1921 after the District Court had rendered a decision favorable to

---

**22.** This opinion will refer throughout this section to a " 'quoted' or 'list' " price in accordance with defendant's usage.

**23.** See supra note 2.

the bottlers and the bottlers had received favorable indications during oral argument before the Court of Appeals for the Third Circuit. PX 601. A Memorandum of Settlement using a "market price" formula was signed on June 18, 1921.

Sizer, the attorney for the first-line bottlers, wrote to John Sibley, the attorney for the Whitehead-Lupton Company, on March 4, 1921 explaining the rationale for the decision to base the price of Coca-Cola syrup on the "market price" of sugar.

> They [the actual bottlers] are willing to pay a price for the Coca-Cola syrup that is not in excess, or greatly in excess, of the prices at which other soft drink syrups are sold. If they can get their syrup at that price it is entirely immaterial with them whether The Coca-Cola Company and the parent bottling companies make ten cents a gallon or fifty cents a gallon profit. On the other hand they cannot prosecute their business successfully if the price of Coca-Cola syrup is out of proportion to the prices of other syrups; and for example they cannot do business at all if they should have to pay as much as $2.22 per gallon for Coca-Cola syrup when other soft drink syrups are selling at around $1.50 to $1.75 per gallon.... The prices which the actual bottlers are willing to pay and able to pay cannot be controlled by the question of profits which the manufacturer of the syrup or the parent bottling companies are asking, but it must depend on the market price of other syrups of similar character.

PX 581. Sizer wrote Rainwater in a similar vein on March 11, 1921. PX 587.

This history reveals the actual bottlers' anxiety over their competitive position. They were willing to pay some minimal premium above their competitors so long as they remained able to compete. *See* PX 581, PX 587. Also apparent, however, is the bottlers' concern with verifying the Company's cost figures. Both plaintiffs and defendant agree the bottlers at this juncture greatly distrusted The Coca-Cola Company, *see* Dkt. 348, at 78; Dkt. 364 ¶ 140(g), because of the Company's insistence in late 1920 on recouping its costs at the expense of the bottlers, and its reluctance to open its books for inspection.

Plaintiffs' definition of market price as the actual selling price is fully consistent with the objective of obtaining a competitive price but is less convincing when weighed against the objective of verification. Conversely, defendant's definition comports well with the need for verification but utterly fails to meet the need for a competitive price. Merely examining the objectives of the parties is thus not determinative in deciding how to interpret "market price" as used in the 1921 Consent Decrees.

### B. *Ordinary Meaning*

Plaintiffs seek to establish that "selling price" was the ordinary meaning of the term "market price," as defined by dictionaries and case law roughly contemporaneous with the 1921 Consent Decrees. *See Carey Lithograph Co. v. Magazine & Book Co.*, 70 Misc. 541, 624, 127 N.Y.Supp. 300 (1911) (defining market price as "a price fixed by a buyer and seller in an open market, in the usual and ordinary course of lawful trade and competition."); 3 Universal Dictionary of the English Language 3043 (1899).

Establishing the ordinary meaning of "market price" does not significantly advance plaintiffs' position. In light of defendant's failure to rebut these definitions, a presumption does arise that they were used by the parties. The presumption is not a strong one, however, for these definitions reflect ordinary commercial understanding and are not linked to the sugar trade. Plaintiffs have presented no evidence as to how "market price" was defined for the sugar market, with which the Consent Decrees were concerned.

### C. *Contemporaneous Usage by the Parties*

Plaintiffs also argue the parties' contemporaneous usage of the term "market price" indicates they understood it to be synonymous with the actual selling price

and quite different from a "list" or "quoted" price.

### 1. *Before Execution of the Consent Decrees*

A number of those principally involved in the 1920–21 Delaware litigation expressly distinguished between The Coca-Cola Company's cost of sugar and the "market price" of sugar in statements to the effect that they understood the Company's cost of sugar was less than the prevailing "market price." [24] *See* PX 1 (R. 1609) (Charles Howard Candler), PX 1 (R. 2588) (C.V. Rainwater and George T. Hunter); PX 557, PX 563 (correspondence between W.C. Bradley, Chairman of the Board of The Coca-Cola Company in February, 1921, and C.V. Rainwater). Plaintiffs urge this usage reflects the parties' understanding that the Company was using sugar purchased in advance of use under long-term contracts. *See* Dkt. 364 ¶¶ 147–50. The bottlers expected the Company's "cost of sugar" would approximate the "market price" once the Company began to buy sugar currently on the market. *See* PX 463 (J.B. Sizer to Crawford Johnson (Oct. 18, 1920) ("I am very much inclined to the opinion that when the first of November comes around we will find that they will be buying sugar at or about the prices then quoted on the market.")); *see also* PX 474 (C.V. Rainwater to C.H. Candler (Oct. 30, 1920) ("there has been a great reduction in the market price of sugar, and we are unable to understand why there is not a considerable reduction in the cost of the manufacture of bottler's syrup.")).

This evidence does tend to show that by "market price" the parties meant a price at which sugar could be bought—an actual selling price, as plaintiffs contend. Assuming the parties intended "market price" to be an actual selling price, however, does not run counter to defendant's assertion that "market price" meant a "quoted" price at which some sugar was sold. As defendant points out, J.B. Sizer, the attorney for the first-line bottlers, used the term "the price *quoted* on the market" (emphasis added) to describe the price at which the Company "will be buying sugar". PX 463.

Plaintiffs cite, as particularly probative of their contention that the parties distinguished "market price" from a "list" or "quoted" price, an exchange between the parties with regard to the Company's 1920 contract with American Sugar Refining. On October 30, 1920, Rainwater wrote Candler inquiring why the price of syrup would be increased as of November 1, since the bottlers had understood

> that The Coca-Cola Company had a contract with one of the largest refiners in the country for a sufficient quantity of sugar to meet your requirements for the year 1920, the price to be determined by the market price every Monday morning.

PX 474. Candler responded The Coca-Cola Company had entered into an agreement "for a specific quantity of sugar to be delivered each week for a specified number of weeks, the price to be determined by the refiner's price in effect each Monday morning," but that deliveries had been completed on that contract on August 16, 1920. PX 482 (Nov. 3, 1920).

In their Supplemental Complaint filed with the District Court in February, the bottlers charged the Company with fraud by having represented to them that the Company had "a verbal agreement with a large sugar refinery to supply [its] needs for the balance of the year, at a price fixed by the market price prevailing each Monday morning." PX 3 (Supplemental Complaint ¶ 3). The Company in its answer controverted the bottlers' understanding of this particular contract:

> This price was not dependent upon the market price of sugar, but was dependent upon the price made on every Monday morning by the American Sugar Refining Company.

PX 3 (Answer to Supplemental Complaint ¶ 13). The Company went on to state

---

**24.** The litigants do not contend that "market price" is to be equated with the Company's cost of sugar.

that the market price of sugar, as of date August 27, 1920, varied according to the quotation of different refineries, and that on that date the variation was from 17¢ to 22½¢ per pound, and on September 17th it likewise varied from 15¢ to 22½¢ per pound, and on October 29th it likewise varied from 11¢ to 12¢ per pound; that the refineries were practically making their own prices, showing that there was no stability to the market and the purchases made were small, and that if any attempt had been made to make large purchases the sales price of sugar would have immediately ascended.

*Id.* ¶ 6, at 5–6.

The Court cannot agree with plaintiffs that the parties' exchange over the American contract indicates the parties distinguished between a "market price" and a "list" or "quoted" price. On the contrary, it tends to show the parties understood a price "quoted" by the refineries to be a "market price." Candler told the bottlers in June that the Company would be purchasing at a price named by the refiner every Monday morning. This "named" price the parties understood to be an "actual selling price"—and they also equated this "named" or "quoted" price with the "market price," as evidenced by Rainwater's letter and by the Supplemental Complaint.

Plaintiffs point out that the Company in its Answer to the Supplemental Complaint expressly distinguished between "market price" and "named" price ("the price made on every Monday morning by the American Sugar Refining Company"). This distinction is not persuasive as to the parties' usage. The parties were then locked in acrimonious litigation; it is not to be wondered that the Company would quibble pedantically over exactly how Candler had represented the American contract to the bottlers.

The Court concludes the lesson the bottlers drew from the American contract was

not that "market price" was to be distinguished from a "list" or "quoted" price, but that "market price" should not be tied to the price of any one refinery. The bottlers were agonizingly aware of the volatility of the sugar market during 1920 and that the price from one refinery to another could vary more than 30%, *see supra* p. 1410 (Answer to Supplemental Complaint ¶ 6). Where, as here, the Coca-Cola Company had purchased sugar from a refinery at prices near the high end of the scale, which refinery's "market price" was used was significant. This lesson was reflected in the requirement of paragraph 7 of the Consent Decrees that the market price be determined by "averaging" the price "as quoted at the refineries" by the ten largest domestic refineries.

Thus, the pre-Consent Decrees usage tends to establish that by "market price" the parties meant an actual selling price. The evidence does not support an inference that the parties distinguished between an actual selling or "market price" and a "list" or "quoted" price.

### 2. *After Execution of the Consent Decrees*

On July 25, 1921, the three Whitehead-Lupton companies sent letters to their first-line bottlers notifying them of the terms of settlement. PX 645. The letters were approved by counsel for the Company, counsel for the parent bottlers, and counsel for the first-line bottlers. Admitted Facts ¶ 104. On August 9, 1921, the Thomas Company sent their first-line bottlers a substantially identical letter, which also received approval from all parties. *See* PX 655, PX 656.[25] Both letters stated that, as of November 1, 1921, the price of Coca-Cola syrup under the Settlement Agreements was

$1.30 per gallon, including 5¢ for advertising matter, with a provision for arbitration covering abnormal or burdensome conditions or occurrences, to continue only during same, and subject to an in-

---

25. The letter to bottlers in the Whitehead-Lupton territory also sought their consent to the 1921 Amendment to the first-line perpetual con-

tracts which was sent with the letter. *See* PX 645.

crease based on any increase in cost of sugar above 7¢ per pound.

PX 645.

This use of the term "cost of sugar," in a communication to the bottlers explaining the settlement, reflects a deliberate choice of words. The settlement was vitally important to the parties, and the pricing provision was key; counsel for the Company would not have approved inaccurate wording. Moreover, this terminology was also used during 1923 and 1924 in letters sent by The Coca-Cola Company to the parent bottlers stating the price of syrup during the first seven days of the quarter. In these letters the Company used the term "cost of sugar" interchangeably with "market price of sugar." Admitted Facts ¶ 109. With the exception of July 1923, the accompanying charts sent out also used the term "Average Cost," not "Average Market Price." PX 995; DX 171.[26]

Plaintiffs' definition of "market price" finds some support in this usage. Certainly the parties understood "market price" to be the "cost of sugar" or "actual price" paid by purchasers. However, this understanding of "market price" does not impose upon the Company any obligation to consider the lowest actual selling price as the "market price." [27]

### D. *Course of Performance*

Up to this point, the litigants' contentions have shed little light on construing the Consent Decrees. Far more probative of the parties' intent is the actual course of performance under the contract.

### 1. *1922–24*

#### a. *The Letters Between Candler and Rainwater*

In February 1922 C.V. Rainwater and Charles Howard Candler exchanged letters relating to the calculation of the average market price of sugar during the first seven days of January, 1922.[28] Their figures were in agreement, except that Rainwater had deducted a 2% discount for cash payment.[29]

An internal memorandum to Candler dated February 15, 1922 stated that the "revised figures on the average cost of sugar" given were "based upon the actual quotations made by brokers in market letters to us over the first week in January." DX 151. It appears these broker quotations were used by Candler. There is no evidence the parties used the refined sugar quotations in the *Daily Sugar Trade Journal,* a trade publication issued by Willett & Gray (hereinafter cited as "Willett & Gray"). However, the price of sugar arrived at by the parties is consistent with averaging the basis prices of standard fine granulated sugar published as "refined sugar *quotations*" (emphasis added) in Willett & Gray. Tr. 2486–87, 2634–38 (Eichner). As will be seen from the follow-

26. Defendant objected to the completeness of Plaintiffs' Exhibit 995 on the ground that one version of the syrup price notice for April, 1923 which has been otherwise identified at trial as Defendant's Exhibit 171 had been omitted. Dkt. 361, Objection 2. Since the Court has taken defendant's exhibit into account in using this information, the omission has been remedied, and defendant's objection is moot.

27. Similarly, the parties' use of "cost of sugar" in other documents of that era, *see* PX 995 (CS1206, CS1203) (C.H. Candler); PX 995 (CS1191, BY1724) (Harrison Jones, Executive Vice-President); DX 148, 154 (Horace Garner, Assistant Director of Purchasing), is no more persuasive.

28. This was the first time the formula was calculated, since the pricing mechanism had first gone into effect during the prior quarter. The pricing escalator was not in effect, however, because the price of sugar was below 7¢ a pound. Tr. 2484 (Eichner).

29. The parties disagreed over whether the standard 2% cash discount allowed by a refiner for payment within seven days should be deducted from the market price. The bottlers ultimately acquiesced in the Company's position that the 2% discount was not to be deducted, Dkt. 364 ¶ 195, because as Candler pointed out, "[i]t is optional with the purchaser as to whether he avails himself of this discount." PX 702 (C.H. Candler to C.V. Rainwater (Feb. 15, 1922)). *See also* DX 149 (H. Hirsch to C.H. Candler (Feb. 13, 1922) (stating cash discount not be taken into account in determining market price, since "[i]t is something taken off or deducted ... at the option of the purchaser")).

ing discussion of the Willett & Gray market reports, this exchange of correspondence indicates the parties were agreed "market price" meant prices quoted by the refiners, and not necessarily the lowest "actual" selling prices.

During the first few days of January, 1922, Willett & Gray reported differences between the quoted price and the selling price. On January 4, Willett & Gray reported "[w]hile no change is openly reported from the 4.90¢ basis, we have advices from some sections which state that other New York refiners beside the Federal [whose basis was 4.80¢] are selling at 4.80¢." DX 162 (willett & Gray (Jan. 4, 1922)). The next day, the report continued in like vein: "The New York refiners, with the exception of Federal who name 4.80¢, continue to quote 4.90¢ but there is irregularity in prices for out-of-town shipments, some New York refiners selling at the 4.80¢ basis in those localities." DX 162 (Willett & Gray (Jan. 5, 1922)). And finally, on January 6, Willett & Gray wrote: "[t]he quotation of 4.90¢, as far as New York is concerned, can only be considered as nominal as several refiners are quietly quoting 4.80¢." DX 162 (Willett & Gray (Jan. 6, 1922)). Throughout these three days, however, the "refined sugar quotations" given by Willett & Gray continued to be 4.90¢ for all refiners except Federal. DX 162.

Willett & Gray clearly drew a distinction between the "quoted" price and the "actual" selling price. That the parties used figures consistent with the quoted price and apparently did not use the lower selling price, even when the "quoted" price was only nominal, tends to support defendant's position that "market price" means "quoted price."

### b. *Computation of the Formula: 1923–24*

In 1923 and 1924, sugar exceeded 7 cents a pound during the second, third, and fourth quarters of 1923 and the first, second, and fourth quarters of 1924. Admitted Facts ¶ 107. The evidence from this period consists of the telegrams sent and received by the Company; the Company's calculations as compared with the daily Willett & Gray; and language used in Willett & Gray.

#### i. *The Telegrams*

The only evidence available from the 1923–24 period indicates The Coca-Cola Company obtained the "market price" by sending the refineries daily telegrams during the first seven days of each quarter asking: "Will you wire us collect your market price standard fine granulated close of business yesterday." PX 724; Tr. 2448–49, 2601 (Eichner). Plaintiffs urge use of the phrase "close of business yesterday" in conjunction with the words "market price" supports their position that by "market price" the parties mean "actual selling price." "[C]lose of business yesterday," under this argument, means "the last transaction of the day." Defendant, on the other hand, argues "close of business yesterday" merely sets a uniform and readily ascertainable time to take the list price, which could change during the course of a day. Because both interpretations are equally plausible, this wording supports neither side. Moreover, plaintiffs' argument is undercut by the telegram of April 7, 1924, which asks for the price of standard fine granulated "at once instead of at close of business." PX 732.

The Company received various responses from the different refiners. Two telegrams referred to a "list" price, DX 201 (CS2234; CS2241), five used the words "quoting" or "quotation." DX 201 (CS2237; CS2288; CS2266; CS2277; CS2284). Some telegrams simply gave a price, DX 201 (CS2236; CS2243; CS2244; CS2245; CS2247; CS2265; CS2256; CS2276; CS2283), others "market price today," DX 201 (CS2238), or "our price today." DX 201 (CS2238; CS2279; CS2280; CS2286). The greatest number gave a price "at close business" or "closing price." DX 201 (CS2246; CS2251; CS2252; CS2255; CS2248; CS2249; CS2258; CS2267; CS2259; CS2260; CS2261; CS2263; CS2268; CS2269; CS2271; CS2273; CS2278; CS2282; CS2285;

CS2253). Two telegrams gave both an asking price and a bid price. DX 201 (CS2242; CS2274).

The telegrams simply giving a price or a "market price" are of no assistance in resolving the definitional dispute over "market price." Similarly, those telegrams giving a price "at the close of business" could support both sides. A few of the telegraphed responses tend to support defendant's position. Those telegrams that gave both an asking and a bid price were plainly not reporting an actual selling price. Moreover, that some refiners telegraphed a "list" or "quoted" price indicates those refiners equated that price with "market price."

ii. *Examination of the Calculations*

Comparison of the Company's figures with the daily Willett & Gray [30] for the relevant quarters of 1923 and 1924 reveal the Company uniformly used prices .05 cents per hundred-weight above the Willett & Gray quotations for April 2, 3, 4, 5, and 6, 1923, *compare* DX 164 (Willett & Gray) *with* PX 995 (CS1181) (Company calculations); for July 2, 3, 5, and 6, 1923, *compare* DX 176 (Willett & Gray) *with* PX 995 (CS1181) (Company calculations); and for October 1, 2, 3, 4, and 5, 1923, *compare* DX 186 (Willett & Gray) *with* PX 995 (CS1184) (Company calculations).[31] Similarly, for January 2, 3, and 4, 1924, the parties used a price corresponding to the quotations published in Willett & Gray, plus a .05 cents differential. *Compare* DX 195 (Willett & Gray) *with* PX 995 (CS1186) (Company calculations). For January 7, 1924, the prices used by the Company differ markedly from those reported by Willett & Gray. For American, the price used by the Company is .15 cents below Willett & Gray. In every other instance, the Company's price ranges from .15 cents to .25 cents above that reported by Willett & Gray. *Compare* PX 995 (CS1195) (Company calculations) *with* DX 195 (Willett & Gray).

For the second quarter of 1924, the Company's figures are uniformly .05 cents above the quotations printed by Willett & Gray. *Compare* PX 995 (CS1195) (Company calculations) *with* DX 197 (compilation of quotations published by Willett & Gray). The Company's figures for the fourth quarter of 1924 are identical to the basis price given in Willett & Gray. Tr. 2484–87; 2634–41 (Eichner).

iii. *Trade Usage in Willett & Gray*

The Willett & Gray reports make it plain that, during this period, "list" price and "quoted" price were the same; and that the actual selling price may have been lower than this price. Willett & Gray also indicates that sales "off list" presage a downward shift in the list, to reflect the actual selling price.

**30.** The parties were able to produce copies of the daily edition of Willett & Gray for most, but not all, of the relevant dates.

**31.** Willett & Gray published only the "basis price," which is the price for the grade of sugar known as standard fine granulated sugar. Prices for other grades of sugar were quoted plus or minus a differential from the basis price. In the early 1920s, the basis represented 100 pounds of standard fine granulated sugar in cotton bags. Tr. 758–59 (Mount); DX 312 (F.A. McCaffrey, Lamborn & Co. to John M. Mount (Dec. 3, 1957) (reporting on historical sugar basis grades)). Fine granulated sugar packed in 100–pound paper bags was on March 21, 1947 established as the basis grade by order of the Office of Price Administration. DX 310 (John M. Mount to John C. Staten (Nov. 29, 1957)). Although late in 1947 the refineries ceased to quote a basis price only, and began to give prices for each grade of sugar carried, the trade continued to consider the price of fine granulated sugar in 100–pound paper bags to be the basis price, and that continued to be the only price carried by trade publications such as Willett & Gray. *Id.*

There is some dispute between the parties as to whether the Company in 1923 and 1924 computed the "market price" using the basis price of standard fine granulated sugar, or the (higher) price for standard granulated sugar, a coarser grade. The Court makes no finding with regard to this dispute. Following World War II, The Coca-Cola Company has consistently interpreted the term "standard granulated sugar" in paragraph 7 of the Consent Decrees as the "basis price" of fine granulated sugar. *See* Tr. 744–45 (Mount); PX 830; PX 839. This consistent course of performance by The Coca-Cola Company has waived any claim it may have had to use the price of the coarser grade of sugar known as standard.

Thus on October 3, 1923, Willett & Gray noted the list prices of 9.50 cents "in many instances ... are not maintained." DX 186 (Oct. 3, 1923). For January 2, 1924, Willett & Gray reported: "Federal and Arbuckle quoting 8.70¢, and although the other refiners have thus far not changed their list price from 8.90¢, there are some accepting business at 8.80¢." DX 195. Similarly, for January 3, 1924, Willett & Gray stated: "Federal and Arbuckle quoting 8.70¢ with the other refiners' list at 8.90¢, although most of the latter are selling at 8.80¢." DX 195. For January 4, Willett & Gray observed "[t]here is no change in the situation, although ... some of the New York refiners other than Federal and Arbuckle are willing to sell at the 8.70¢ basis but ... this price is not available for the Metropolitan District. Federal and Arbuckle continue to quote 8.70¢." DX 195 (Willett & Gray). The "Refined Sugar Quotations" published in Willett & Gray for January 2, 3 and 4, 1924, indicate that only Federal and Arbuckle were at 8.70 cents; the others (American, National, Warner, and E. Atkins & Co.) were at 8.90 cents. *Id.* Six months later, on July 7, 1924 Willett & Gray reported that all refiners (other than Arbuckle, Federal, and Atkins) "either quote or are selling at" 6.90 cents. DX 207 (Willett & Gray). The quoted price for American on that date was 7.00 cents, not 6.90 cents. *Id.*[32]

At least by the end of this period, the parties were aware there was a difference between the "quoted" price and the actual selling price. On January 11, 1924, John Sibley wrote to Harold Hirsch:

It has been called to my attention by some of the local bottlers that sugar is being quoted at the Refineries generally at about 10 points higher than business is actually being accepted.

I would be glad if you would look into this and advise me if you do not think that this should be taken into consideration in fixing the price of syrup during the next quarter, if my information is correct.

DX 199. Hirsch did not agree: "it just occurs to me that this suggestion possibly involves a change of the contract, and if that be so then our clients should take the matter up." DX 200 (H. Hirsch to J.A. Sibley (Jan. 12, 1924)). This is the first direct indication that the actual bottlers were aware the Company was using "list" or "quoted" prices, rather than actual selling prices to calculate the price for syrup. Apparently the bottlers' disagreement with the Company's practice was not resolved.

### iv. *Conclusion: 1922–24*

This early history of the parties' interpretation of the price-escalator clause of the Consent Decrees reveals the Company undertook the duty of independently ascertaining the "market price" by sending telegrams directly to the refiners. The evidence, particularly as shown by the figures used by the Company on January 7, 1924, reflects the Company did not rely on the quotations given by Willett & Gray, although as a major sugar purchaser the Company could not have been unaware of such a well-known trade journal.

The evidence also shows the parties knew there was a distinction between the "quoted" price and the actual selling price. The parties disagreed, during that period, over whether the bottlers should get the benefit of the lower selling price. Apparently, however, the bottlers did not pursue this claim, and permitted the Company to price Coca-Cola Bottlers Syrup according to the higher, "quoted" price.

### 2. *1947 to Present*

Since the third quarter of 1947, the price of sugar has been consistently more than 7 cents a pound. In this period, there is evidence of the Company's practices from several internal memoranda, as well as testimony from persons in the Company's pur-

---

32. Similarly, on January 5, 1925, Willett & Gray reported that although American and National were quoting 7.10 cents, they were selling at 6.75 cents. *See* DX 383. The price-escalator provision was not in effect during the first quarter of 1925 because the average price of sugar had dropped below 7 cents per pound for that quarter.

chasing department. Particularly critical are two memoranda from Homer Thompson, and a 1956 memorandum from C.W. Hodgson.

During World War II and until October 31, 1947, the Coca-Cola Company was paying the ceiling prices for sugar as established by the Office of Price Administration. Tr. 797–801, 830 (Leslie). Because of the price controls in effect at this time, the prices published by Willett & Gray and the refiners' quotations were identical to the selling price.

In June, 1947, with the price escalator provision to be reactivated after 21 years of dormancy, E.J. Forio, the President of the Coca-Cola Company, wrote to DeSales Harrison, the President of the Thomas Company, to confirm the parties' understanding as to how "market price" was to be determined. He explained that quotations were taken from Willett & Gray, "for many years the universally recognized standard statistical service on sugar," and that where Willett & Gray publication dates did not coincide with the contract dates, the Company would "obtain the necessary quotations directly from the refineries." DX 291 (June 3, 1947); PX 811 (same). Thus, the Company continued to undertake an independent investigation into the market price.

By 1954, under Homer Thompson, it appears the Purchasing Department would use the actual selling price of sugar when it was lower than the quoted price. In a memorandum to E.J. Forio, Thompson wrote:

> Imperial Sugar Company advised us that their selling price (not just their quoted market price) for the entire month of April was $8.65 per cwt. in paper bags. In May they did revert to an earlier $8.30 per cwt. price but according to telephoned advice from this refiner this was not done until May 11th.

Accordingly we were entirely in order in using 8.65¢ per pound as Imperial's quoted price for the first seven days of the second quarter [April 1–7] (parentheses in original).

DX 304 (June 9, 1954). This investigation into the difference between the selling price and the quoted market price was initiated because of a letter from a Texas bottler advising of the discrepancy. *See id.; see also* DX 303 (F.G. Blake to Mac Simms (June 2, 1954) (advising that Imperial Sugar Company's "posted" price advance of 35 points "was not effective")).

A July 6, 1956 memo by Homer Thompson indicates the Purchasing Department would deduct from the "list price" a discount or allowance (except for a discount for cash payment) in order to arrive at the "market price" for purposes of the Consent Decrees. *See* PX 824 (AS6370). Plaintiffs state this shows the Company interpreted the "market price" to be the actual selling price of sugar after deducting from the refiner's "list price" any discounts or allowances (other than the two-percent discount for cash). Dkt. 364 ¶ 231. The Company asserts this memorandum actually supports its position: that the Company would take into consideration a generally announced allowance off list, available to any purchaser—"in short, a list price." Dkt. 366, at 42. The testimony cited by the Company in support of this proposition was merely that the refiner "had an allowance in part of the territory which they told us about and which was used." Tr. 2984 (Power).[33] This testimony does tend to establish that the discounts deducted from the list price by the Company were not "secret," but could be obtained simply by querying the refiner. The testimony fails to establish that these allowances were available to any purchaser, however. In addition, the evidence fails to support the Company's position that this allowance or discount meant the refinery had set a new list price. Possibly a discount presaged a downward shift

---

33. Around this time some allowances from the list price were being announced publicly. In late 1957, the Great Western Sugar Company announced it would grant a bulk shipment allowance; and, in the Milwaukee-Chicago-St. Louis area, direct-factory-shipment allowance. DX 311 (Great Western Sugar Co., Brokers Circular Letter No. 191 (Dec. 2, 1957)).

in the refiner's list price. However, the June 9, 1954 Thompson memorandum conclusively established the Company used "selling price" not "quoted" or "list" price, which is reenforced by the July 6 Thompson memorandum.[34] Rather, the "net" of the "list price," with an "allowance" deducted, represented the "market price."

In a 1956 memo from C.W. Hodgson, a Vice President of the Company, to Homer Thompson, the procedure for ascertaining the market price was set out following an inquiry from DeSales Harrison of the Thomas Company. DX 307 (August 20, 1956); PX 825 (same). Hodgson wrote he had investigated the question "thoroughly" with the Purchasing Department and with Ben Oehlert and Edgar Forio, both of whom were Vice Presidents of the Company, and had also done some "digging back into the files." The memorandum memorialized a telephone conversation between De Sales Harrison and Hodgson which recounted the Company's position. *Id.*

The memo noted that list prices given in Willett & Gray could not always be used because their publication dates did not coincide with the contract dates. It continued, at paragraph 3:

> [A]t times a refinery will sell below its own list price and that quoted by Willett & Gray. Under such circumstances the Purchasing Department has been using the lower price.... [W]here there was a possibility of two interpretations ... the Thomas Company and the Bottler had in every instance benefited.

*Id.*

Both Donald Leslie and John Mount, each of whom headed the Purchasing Department subsequent to Homer Thompson's tenure, testified the Hodgson memorandum was not a new policy, Tr. 917, 918

(Leslie), but was a truthful statement of the Company's interpretation of "market price" as used in paragraph 7 of the Consent Decrees. Tr. 868, 918–19 (Leslie); Tr. 786–87 (Mount). Leslie testified the Purchasing Department followed the policy stated in paragraph 3 of the Hodgson memorandum in computing the average market price of sugar during his tenure as head of the Department from 1960–69. Tr. 878.

The Company's computation of the formula for the first quarter of 1958 shows it used as sources for the refineries' prices Willett & Gray's *Weekly Sugar Trade Journal,* supplemented by daily market reports from Lamborn, a broker's bulletin, and several refinery price lists. DX 316 (H.B. Thompson to C.W. Hodgson (Jan. 8, 1958) (reporting average market price of refined cane sugar)).

The available evidence thus indicates that during the post-World War II period the Company has continued to make an independent investigation into the "market price," and has not relied solely on the refiners' list prices. In fact, the 1956 Thompson memorandum, *see supra* p. 1415, and the Hodgson memorandum both indicate the Company used the official price list merely as a ceiling from which the "market price" was derived, after deductions for such items as discounts or freight charges.[35] The Company underscores that Willett & Gray published actual selling prices, not "a fictitious list price." Tr. 843 (Leslie). This misses plaintiffs' argument that the Company is obligated to use a lower selling price if it is or should be aware one exists. The Hodgson memorandum strongly supports plaintiffs' view.

Plaintiffs allege this policy of the Purchasing Department changed in 1969 to the

---

**34.** Other evidence also indicates that under Homer Thompson's tenure the Company did not simply use the refiners' list prices. Thus, in arriving at the averages for various refineries, the Purchasing Department averaged a refiner's quoted prices for different market areas. *See* DX 317 (reporting quoted market prices for 10 largest refineries for first quarter of 1958). This was also the practice in the first quarter of 1962. *See* DX 330. And, at least during 1959, the

Company was unable to use the list price, for beginning in February and March of that year refineries ceased to quote an f.o.b. price. The Purchasing Department therefore deducted the prepaid freight charges to arrive at an f.o.b. price. DX 323 (H.B. Thompson to John C. Staton (Apr. 3, 1959)).

**35.** *See supra* note 34.

use of official list prices. Since that time, telexes sent by the Company to sugar refiners have asked for the "official list price." DX 343. This price is then used as the "market price" under the 1921 Consent Decrees unless the Purchasing Department is able to obtain from a refinery written confirmation that there has been a change in its official list price. Tr. 2830–35 (Konzal).[36] The Company denies this represents a change in policy.

The Court agrees with plaintiff that this new procedure of using only an "official price list" represents an abrupt change in policy and deviates from the Consent Decrees. The Hodgson memorandum, the Thompson memoranda, and other documentary evidence from the 1950s make it clear the Company did not confine itself to ascertaining the "official list price." The Hodgson memorandum specifically acknowledges that where there were two known prices at which sugar was sold, the Company used the lower price. No mention is made of always using a list price. The Thompson memoranda reflect that prices other than "official list prices" were used if the Company was able to verify with the refiner the accuracy of the lower price.

### E. Conclusion: "Market Price" in Paragraph 7

The evidence does not support plaintiffs' definition of "market price" in its entirety. Nor is defendant's position wholly vindicated.

As noted previously, the circumstances leading up to the signing of the Consent Decrees reveal that the parties wanted a pricing formula for Coca-Cola Bottler's Syrup which would ensure that Coca-Cola would be competitive with other soft drinks, and which would also be verifiable. The inferences to be drawn from these objectives did not strongly support either side, however. The objective of pricing the syrup competitively supports plaintiffs' contention that "market price" is an actual selling price. The objective of having a verifiable price, on the other hand, tends to support the Company's position that market price is an "official list price." *See supra* p. 1408.

The parties' contemporaneous usage of the term "market price" provides some evidence that by "market price" the parties to the Consent Decrees meant "actual selling price." *See supra* pp. 1409, 1411. However, this evidence does not support an inference that the parties distinguished between an actual selling price or "market price" and a "list" or "quoted" price. *See supra* pp. 1409–10.

By far the most probative evidence is the parties' course of performance. The evidence tends to show that both during the early 1920s and in the post-World War II period there was a distinction in the sugar trade between a "quoted" or "list" price and an actual selling price. *See supra* pp. 1412, 1413–14, 1415, 1416. The parties were aware of this difference, *see supra* pp. 1414–15. During 1924 there was disagreement between the parties over whether the syrup should be priced according to the lower price. This was apparently never resolved. *See supra* p. 1414.

The evidence available from the post-World War II period indicates "market price" was interpreted, from at least 1956 until 1969, in accordance with the Hodgson memorandum.[37] This memorandum, whose

---

**36.** The refineries maintain separate price lists for purchase of bulk sugar in carload lots by industrial users. Tr. 757 (Mount). The Company has used this price to calculate "market price" since 1971, on the ground that bulk sugar in carload lots represents the new basis price. PX 852; PX 853; PX 854. *See supra* note 31 (explaining basis price).

**37.** It is undisputed that since World War II the Company has consistently used, as the "market price" of sugar, the price for granulated sugar of the grade and in the packaging unit most commonly used in the sugar trade by industrial users. This was at one time referred to as the "basis" price. The trade continues to use this term, although the refiners no longer quote in terms of a basis price. *See supra* note 31.

Since the third quarter of 1971, the Company uses the price for fine granulated sugar in carload lots for industrial users as the "basis" price. PX 852 (J.M. Mount to J.H. Ogden (May 14, 1971)); PX 854 (W.L. Susong to W.R. Randolph (July 8, 1981)) (announcing charge to bottlers).

contents were communicated to the bottlers, established that the Company would use as a ceiling price the refiners' "list" or "quoted" price, which is a price quoted prior to sale and before any negotiations between the buyer and the seller. The Company would also undertake to ascertain from the refiner if the actual selling price was less than the "quoted" or "list" price. If it was, the Company would use that lower price.

In ascertaining whether a refiner is selling below its "list" or "quoted" price, the Company has traditionally made direct inquiry of the refiner. There is no evidence that the Company asked the refiner whether this lower selling price was available to *all* industrial users of sugar, however. Rather, it appears the Company has used the greatest discount, rebate, or allowance available. The only criterion for whether the Company would use a particular selling price is whether the refiner would represent to the Company that sugar was being sold at that price.

It appears that, during the 1950s, the Company would also query refiners upon receiving from its bottlers information that a refiner was selling below its "list" or "quoted" price. *See supra* p. 1415. However, the Company has apparently never formally inquired of its bottlers what they are paying for sugar, nor taken into account its own negotiating experience, and it does not appear the Company has a duty to do so.

The policy contained in the Hodgson memorandum was communicated to the bottlers. DX 307. This policy has been accepted by the bottlers as the proper interpretation of "market price." The bottlers have not been informed of any superseding policy; indeed, the Company claims there has been no change. The Court concludes the Hodgson memorandum correctly sets forth the policy of The Coca-Cola Company with respect to market price.

"Market price" as used in paragraph 7 of the Consent Decrees means an average of the price per pound for refined granulated sugar of the grade and in the packaging unit in which it is principally sold to industrial users f.o.b. the refinery, as made known to such industrial users upon inquiry prior to sale by the ten refineries in the United States with the largest capacity and output during the first seven days of each calendar quarter, less any discounts, allowances, or rebates from that price which are available to industrial users or are made known to them upon inquiry prior to sale, but not including a standard two percent cash discount or any individually negotiated discounts, allowances, or rebates.

## V. *Conclusion*

In the above opinion, which constitutes the Court's Findings of Fact and Conclusions of Law required by Rule 52(a) of the Federal Rules of Civil Procedure, I held on the certified issues relating to the 1921 Consent Decrees that: (1) the meaning of the term "sugar" as employed in paragraph 10 means refined granulated sugar from cane or beet sugar and that HFCS–55 is not sugar for purposes of paragraph 10, and (2) for purposes of paragraph 7 the "market price" of sugar means an average of the price per pound for refined granulated sugar of the grade and in the packaging unit in which it is principally sold to industrial users f.o.b. the refinery, as made known to such industrial users upon inquiry prior to sale by the ten refineries in the United States with the largest capacity and output during the first seven days of each calendar quarter, less any discounts, allowances, or rebates from that price which are available to industrial users or are made known to them upon inquiry prior to sale, but not including a standard two percent cash discount or any individually negotiated discounts, allowances, or rebates.

I must conclude, however, with more than my holdings as to the certified issues. This case was a pleasure to try because of the outstanding ability of both teams of lawyers. The teams were very thoroughly prepared, had complete mastery of the vo-

luminous record, prepared comprehensive trial briefs, tried the matter with graciousness and acumen, and following trial presented very accurate, annotated, and detailed proposed findings of fact and conclusions of law.

I cannot help but observe, however, that the efforts of these extremely talented attorneys may be misdirected. The basic problem is that the 1921 Consent Decrees are being used to govern an ongoing business relationship in the 1980s. Piecemeal litigation cannot satisfactorily resolve this problem. At best this litigation will only enhance or reduce bargaining power for the negotiations which must eventually take place.

There have been advances in technology, marketing, and in product lines and/or product extension which could not be foreseen in 1921 when the Consent Decrees were entered into. The parties would be better served by mutually agreeing to work under a perpetual contract geared to the 1980s with a built-in mechanism for amendment to adjust to future change. Without such a mechanism, the long-term prospects are for unending litigation, as the parties founder in their efforts to adjust an obsolete contract to ever-changing conditions.

These extraordinarily capable attorneys should be able to negotiate a contract to fit the conditions of the 1980s between parties who need each other, provided they are assisted by clients whose unswerving objective is increasing the bottom line rather than incurring horrendous litigation expenses.